JOHN MAGWIRE, Respondent, v. MARY L. TYLER et als., Appellants.

1. *Lands and Land Titles—Patents—Confirmations—Relation.*—Where two patents for the same land are issued by the United States, the elder patent conveys the absolute title, and if nothing more appear the junior patent is void. Where patents are issued upon confirmations by the Government, the legal title by relation takes effect from the first act in the inception of the title, which under confirmations of the old Board of Commissioners was the filing of the claim and papers in support thereof with the clerk; and where a confirmation was made upon a claim not filed by the claimant, the patent can relate back only to the date of the judgment of confirmation.

2. *Lands and Land Titles—Board of Commissioners—Jurisdiction—Confirmations.*—The Boards of Commissioners acting under the authority of the act of Mar. 2, 1805, and Mar. 3, 1807, had no jurisdiction to confirm lands to any person unless he filed his claim and made proof of title as required

Magwire v. Tyler et als.

by the statutes, and a confirmation made without such claim and proofs is void.

3. *Lands and Land Titles—Confirmations—Patents—Equities.*—Under different confirmations under the laws of the United States, the first equities against the Government of which a court can take notice are the inceptive acts, such as filing claims, &c., required by the statutes providing for such confirmations. Prior to such acts, unconfirmed claims or inchoate titles present nothing but an equity addressed to the political power, of which courts cannot take cognizance. The decision of the Government is final as to the comparative merit of all such claims.

4. *Lands and Land Titles—Judgment—Estoppel—Equity.*—A decree in chancery between the same parties, proceeding upon the same substantial facts and grounds of equity, is conclusive. M. brought his bill, claiming an equitable title to a part of a tract of land patented to L. upon the ground that the part claimed had been confirmed to him by the United States, and that the survey made for L. was erroneous. The facts were found, and decree rendered against M. Subsequently M. procured a survey and patent for the land and brought a new bill—*Held*, that the former decree was conclusive as to the equities between the parties.

## *Appeal from St. Louis Court of Common Pleas.*

The plaintiff filed his petition in equity against the defendants on September 18, 1862, in the St. Louis Land Court, as junior patentee under one Brazeau, patent dated June 10, 1862, to divest the title of defendants under a senior patent to Louis Labeaume of 25th March, 1852, issued on a Spanish survey for Labeaume of 1799, and a confirmation of 22d September, 1810, upon a claim by Labeaume filed 26th February, 1806, for confirmation.

The respective titles of the parties were the same as stated in the cases of Magwire v. Tyler, 25 Mo. 433; S. C. 30 Mo. 202, and S. C., on appeal, 1 Black. (U. S.) 195, and West v. Cochran, 17 How. (U. S.) 411, with this exception: that after the decision in 1 Black, 195, the plaintiff procured a U. S. survey and a patent locating the sixteen arpents (confirmed to Brazeau) within the limits of the land confirmed, surveyed for, and patented to, Labeaume.

To the present bill the defendants also pleaded the finding and judgment in the case of Magwire v. Tyler, in the St. Louis Land Court, affirmed (30 Mo. 202), as a bar, as follows:

"*June* 23, 1858.

"This cause came on to be heard before the court, and after hearing all the evidence of the parties, the court find from the evidence the following facts, viz.:

"That on the fifth day of October, in the year 1793, the Spanish Government conceded or granted to one Esther, a free mulattress, a tract or parcel of land situate on the border of the Mississippi river, and between that and the earthbarn, La Grange de Terre, as stated in the plaintiff's petition. The concession to Esther had no definitive location by the terms of the grant, but she took possession under said grant of a tract of land lying between the Big mound and the Mississippi river.

"That on the twenty-fifth day of June, in the year 1794, the said Spanish Government conceded or granted to one Joseph Brazeau a tract or parcel of land of four arpents in front by twenty arpents in depth as described and bounded as stated in plaintiff's petition. That the said Brazeau took possession of said tract or parcel of land so granted by said government about the time of said concession. That afterwards, on the ninth day of May, in the year 1798, the said Joseph Brazeau, by his deed of that date, sold and conveyed the said tract or parcel of land conceded and granted to him as aforesaid to one Louis Labeaume, excepting, however, and said Brazeau in his said deed reserved to himself four arpents of said tract of land ' to be taken at the foot of the hillock in the southern part of said land'; that the said four arpents so reserved by said Brazeau in his said deed to said Labeaume are situate within the limits of the outboundary line of the village of St. Louis, run in conformity to the first section of the act of Congress making further provision for settling the claims to land in Missouri Territory, approved June 13, 1812.

"That after said sale and conveyance to Labeaume by Brazeau, but prior to the fifteenth day of February, in the year 1799, the said Louis Labeaume petitioned said Spanish Government for a grant of three hundred and sixty arpents

of land, including that which he had acquired of said Brazeau—that is to say, twenty arpents in depth from the Mississippi river, ascending Rocky branch west quarter south, by sixteen arpents front, along the Mississippi, to be taken from the descent of the road into the creek as stated in plaintiff's petition; that said Spanish Government caused the land petitioned for as aforesaid by said Labeaume to be surveyed by one Antonio Soulard, acting surveyor under said government at the time stated in plaintiff's petition—which said survey does not embrace any portion of the land reserved by Joseph Brazeau in said deed to Labeaume, dated the ninth day of May, 1798.

"That the Board of Commissioners for the adjustment of land titles, in the Territory of Missouri, on the twenty-second day of September, in the year 1810, confirmed to said Joseph Brazeau the said four arpents.

"That the said Commissioners on the fourteenth day of June, in the year 1811, issued their certificate of confirmation, No. 983, as stated in the plaintiff's petition. That the said Joseph Brazeau and his wife, on the twenty-sixth day of June, in the year 1816, by their deed of that date, con-- veyed all the right, title and interest in said four by four arpents of land to one Pierre Chouteau, which deed was duly recorded as stated in plaintiff's petition.

"That in the month of November, in the year 1817, by authority of the United States, and under the direction of the Surveyor-General for the district of Illinois and Missouri, the said four by four arpents of land were surveyed by Joseph C. Brown, of which the following is a copy.

"'No. 982 & 983. Township No. 45 north, range No. 47 E. of 5th principal meridian. Surveyed by Louis Labeaume *two* tracts in one. The one confirmed in his own name for 356 arpents. The other under Joseph Brazeau for 4 arpents, together 360 arpents, equal to 306¼ acres, beginning at the mouth of the branch, the S. E. corner of Easton's tract; thence down the Mississippi river, bending therewith,' &c. &c. 'November, 1817. (Signed) Joseph C. Brown, D. S.'

"That on the first day of June, in the year 1826, Pierre Chouteau and wife, by their deed of that date, conveyed the said four by four arpents to one George F. Strother ; which deed was duly recorded, as stated in the plaintiff's petition. The said George F. Strother and his wife, on the third day of September, in the year 1830, by their deed of that date, conveyed the said four by four arpents of land, with other tracts of land, to John Mullanphy and John O'Fallon, in trust for the sole use and behoof of the Marine Railway Company.

"That in the month of November, in the year 1840, the said George F. Strother departed this life, and administration in due form of law was had on his estate, and in like due course of law all the right, title, interest and estate of said Strother in and to said four by four arpents of land were sold by the administratrix of said estate and conveyed to the plaintiff.

"That on the second day of January, in the year 1852, John O'Fallon (the said John Mullanphy having before that departed this life), by authority and direction of said Marine Railway Company, conveyed by deed all the right, title and interest of said Marine Railway Company to the plaintiff in the land north of the ditch called Labeaume's ditch.

"That the said tract of four by four arpents of land which was confirmed to said Joseph Brazeau is situate in the northern part of the present city of St. Louis, in the county of St. Louis, on the south side of the old ditch called and known as Labeaume's south ditch.

"That the said Pierre Chouteau, under whom plaintiff claims title to the land in question, on the fifteenth day of October, 1799, petitioned for a tract of land between Roy and Labeaume, of the width of six arpents. That Labeaume's ditches were then made ; that Chouteau in his petition called for the line of the land of Louis Labeaume for his northern boundary ; that at this time Joseph Brazeau had promised to convey the four by four arpents to said Pierre Chouteau. That at the time of the survey made in 1803, the south ditch of Labeaume was recognized by all the adjoining proprietors

as Labeaume's south line ; and that possession was claimed and held with such recognition from the time of said survey in 1803 until about 1823. That all the defendants respectively claim title and the right to possess the part and parts which they do respectively possess and claim of said four by four arpents of land, under one Louis Labeaume or his legal representatives ; and that the defendants do hold, claim and possess portions of said tract of four by four arpents in the manner and to the extent stated in the plaintiff's petition. And that the said tract of four by four arpents of land, at the time of the confirmation thereof to said Joseph Brazeau as aforesaid was not definitively located by the metes and bounds. That on the tenth day of September, 1810, Jacques Clamorgan, who claimed the Esther grant by deed from her, the 2d September, 1797, conveyed the same grant to said Pierre Chouteau.

"And from the evidence aforesaid, the court further finds that said Labeaume, in February, in the year 1806, filed his claim for confirmation before the said Board of Commissioners for the adjustment of land titles for the Territory of Missouri, and said Board of Commissioners confirmed to him three hundred and fifty-six arpents, and to Joseph Brazeau four arpents, as stated in defendants' answer.

"That said Labeaume made the ditches and enclosures mentioned in the defendants' answer. That under the said confirmation to said Labeaume a survey of the tract of land so confirmed was ordered by the Secretary of the Department of the Interior of the United States Government ; and in the year 1852 a survey thereof was made under and in pursuance of the instructions of said Secretary ; and which survey was afterwards approved on the twenty-sixth day of February, in the year 1852 ; and thereupon a patent certificate was issued by the Recorder of land titles, certifying to the effect that Louis Labeaume or his legal representatives was entitled to a patent under said confirmation and survey for $339\frac{68}{100}$ acres, equal to $390\frac{30}{100}$ arpents. That afterwards, and on the twenty-fifth day of March, in the year 1852, a patent

was issued by the Government of the United States, granting said tract of land described in the last-mentioned survey to said Labeaume or his legal representatives, and to his or their heirs and assigns ; saving and reserving, however, any valid adverse rights which may exist to any part thereof.

" That when said last-mentioned survey was made, and also when said patent was issued, as aforesaid, to said Labeaume or his legal representatives, the defendants had knowledge that the plaintiff claimed to be the legal representative of said Joseph Brazeau, under and in virtue of the deeds and conveyances and the documents and proceedings set out in the plaintiff's petition. And that he claimed to have and to hold the equitable title to said four by four arpents reserved by said Brazeau in his said deed to said Labeaume.

" The court further finds that there is no evidence that survey No. 3,333, for Louis Labeaume or his legal representatives, or the patent thereon, were obtained by any fraud whatever.

" That the U. S. survey, No. 3,332, for Joseph Brazeau's legal representatives, was made, and a patent was issued thereon, in 1852, as alleged in the answer of the defendants, for the Brazeau reservation, and that said survey and patent do not embrace any land lying north of said south ditch of Labeaume. That the conveyance made by Labeaume and Chambers in 1816, through whom the defendants claim title, was made upon good and valuable consideration, and without any notice of the equities now set up by the plaintiff. That said Louis Labeaume and those claiming under him have had possession of and have used, occupied and enjoyed the premises in controversy from about 1798 to the time of the commencement of this suit.

" The court decides, upon the foregoing facts, that the plaintiff is not entitled to the relief sought by his bill, and that said petition should be dismissed at the cost of the plaintiff.

C. B. LORD.

"Upon the finding as aforesaid, it is ordered and adjudged by the court that the plaintiff take nothing by this suit in this behalf; but that the defendants go hence without day, and recover of said plaintiff their costs and charges herein expended, and have execution therefor."

*B. A. Hill* and *J. R. Shepley*, for appellants.

I. All the equities, claims, and pretences, now set up by the plaintiff, were adjudicated in a former suit in equity between the same parties and privies, and in regard to the same subject matter. The same identical facts were stated in plaintiff's petition of August 22, 1855—on which the St. Louis Land Court, on 22d June, 1858, entered a finding of all the material facts, under the code of 1849, in favor of the defendants, and a final decree and judgment.

Plaintiff avers in this second suit that he has obtained a new survey and patent in June, 1862, for the Brazeau reservation, in the south-east corner of Labeaume's patent, and claims the same identical equitable relief asked in the former suit.

*A.*—The finding of the facts, and the judgment and decree thereon, in the former suit in equity, being full and specific as to all the equities now set up, the judgment and decree in said former suit is conclusive upon the plaintiff as to all the matters determined or in controversy in said former suit—Lessee of Parrish v. Ferris et als., 2 Black, (U. S.) 608; 2 Sto. Eq. § 1523 and note. Mitf. Eq. Pl. by Jer. 236 –8, states the rule fully and all the cases: "A decree or order dismissing a former bill for the same matter may be pleaded in bar to a new bill, if the dismission was upon hearing, and was not in terms directed to be without prejudice—Id. 238; see 2 Smith's L. C. 424, and note to Dutchess of Kingston's case.

*B.*—The former decree is conclusive of the claims, equities and pretensions of the plaintiff in the former suit in equity as to all the facts found by the court in that suit upon the hearing that were material in the cause—Perine v. Dunn,

27—VOL. XL.

4 Johns. Ch. 142; Neafie v. Neafie, 7 Johns. Ch. 1; Sto. Eq. Pl. § 793; Wilcox v. Badger, 6 Ohio, 406; Jenkins v. Eldridge, 3 Sto. Ch. C. 299; 2 Dan. Ch. Pr. 753–4; Holmes v. Remsen, 7 Johns. Ch. 286; 2 Dan. Ch. Pr. 1209, and 1199 and notes; French v. French, 8 Ohio, 214.

*C.*—The finding of the facts in the former suit under the code of 1849 operates as a special verdict upon all material issues in the pleadings, and are a part of the decree and judgment in the case, and concludes all parties as part of the record—Sutter v. Street, 21 Mo. 157–60; Freeland v. Eldridge, 19 Mo. 325; Bates v. Bower, 17 Mo. 550; Lewis v. Stafford, 4 Bibb, 320; Farrar v. Lyon, 19 Mo. 122; McLary v. Bowman, 3 Litt. 248; Walsh's case, id. 142; Javins v. Harris, 20 Mo. 262; Voorhis v. Bk. of U. S. 10 Pet. 449; Lytle's case, 22 How. (U. S.) 193, 207; Montford v. Hunt, 3 Wash. C. C. R. 28.

*D.*—The present petition asks relief upon the same identical equities and upon the same facts adjudicated and determined in the former suit. Four leading facts are alleged in the former petition and in the present petition to establish plaintiff's equity, to wit:

1. That Soulard made the Spanish survey of the land asked for by Labeaume, in 1799, by mistake or design, so as to include the Brazeau reservation.

2. That the confirmation of 1810· to Labeaume and to Brazeau were so made as to include the four by four arpents of Brazeau within the survey of Soulard for Labeaume.

3. That the Brazeau reservation is properly to be located within the Soulard survey, from the relative position and location of the surrounding tracts.

4. That defendants and their grantors claiming under Labeaume are not innocent purchasers; that they had notice of the reservation being within the Soulard survey for Labeaume, and confederated to procure the patent to Labeaume for Brazeau's reservation.

On each of these allegations the court in the former suit found for the defendants, and decreed accordingly. On these

same allegations in the present petition, the court (Reber, J.) finds exactly the opposite, and they raise the same equity in favor of plaintiff that was determined against him in the former suit.

Plaintiff does not pretend to claim any equitable rights under the new patent of 1862, but insists upon the same four facts on which the finding was had in the former suit, and none other. The finding of these four facts in favor of the defendants, upon the issues made in the former suit, and the judgment and decree entered thereon, are conclusive against the plaintiff in this suit upon all equities claimed herein, for they are *res adjudicata*. See cases cited above under points A, B, and C; also, 3 Dallas, 54; 1 Cond. R. 21; 4 Wheat. 217; 4 Cond. R. 426; 6 Wheat. 108; 1 Mason C. C. R. 515; 3 Cranch, 487.

II. All the equities set up in the former petition and in the present petition are thus disposed of as *res adjudicata*, and the plaintiff stands before the court upon the new patent of 1862 alone.

This second patent, under the same confirmation, if it were not void, raises only a legal title, and gives no equity to assail the Labcaume patent upon equities already adjudicated in the former suit. All the equities now relied upon having been adjudged against the plaintiff in the former suit, the plaintiff must stand upon the new patent alone, and has no remedy except to sue in ejectment; and the new patent could not prevail against the old one at law. Equity cannot aid the junior patentee claiming land covered by an elder patent unless the junior patentee can show beyond a reasonable doubt that the land covered by the elder patent is equitably and rightfully his property under the junior patent.

III. The new patent to Brazeau of 1862 is a nullity; and passes no title or claim of title to plaintiff, for the reason that the United States had previously granted the same land to Labeaume.

By the acts of Congress of 2d March, 1805, and 3d March, 1807 (1 Land Laws, 122 & 153), it is provided that the con-

firmation shall be made to the claimant, and that the patent certificate shall be made to the party confirmed for a tract of land to be designated in the patent certificate—§ 6, act of 1807, p. 154, Land Laws. It is manifest, therefore, that but one patent can issue upon the same confirmation to the same person, and it must be for the parcel of land designated in the patent certificate.

The patent certificate to Brazeau declares that he is entitled to a patent for four arpents of land on the Mississippi, to be surveyed agreeably to a reserve made in a sale of Brazeau to Labeaume, recorded in book C, p. 339, of the Recorder's office. This is the deed of May 9, 1798, which fixes the reservation at "the foot of the mound" four arpents square, and south of the Labeaume tract surveyed by Soulard.

Congress alone has the power to dispose of the public lands, and the title can only pass to Brazeau in accordance with the said acts of Congress—Wilcox v. Jackson, 13 Pet. 498; Landes v. Brant, 10 How. 348, 370 ; Menard v. Massey, 8 How. 293, 306–7 ; Berthold v. McDonald, 22 How. 334, 341 ; Burgess v. Gray, 16 How. 48, 65 ; Willott v. Sandford, 19 How. 79, 82; Strother v. Lucas, 12 Pet. 415 ; Haile v. Gaines, 22 How. 144, 160 ; Chouteau v. Eckhart, 2 How. 345 ; Lafayette's Heirs v. Kenton, 18 How. 197; Doe v. Braden, 16 id. 635, 657 ; Foster v. Neilson, 2 Pet. 253, 307, 309 ; Garcia v. Lee, 12 Pet. 511, 520 ; LeBois v. Brammell, 4 How. 449, 461 ; Mackey v. Dillon, 4 How. 400.

The title passes to a claimant, under the acts of Congress of 1805 and 1807, in the following manner:

1. The claimant files his claim with the Recorder of land titles for the tract of land, and presents his title papers for record. 2. He produces his evidence of possession prior to 1803. 3. Judgment of confirmation is entered of record upon the claim and the evidence. 4. An United States survey of the confirmation is made unless an authentic Spanish survey shall appear of record, as in case of Soulard's survey for Labeaume. 5. A patent certificate is issued on the Spanish

survey or the U. S. survey.   6. The patent—§§ 1–4, act of 1805 ; §§ 1–7, act of 1807.

Under these acts of Congress there were two confirmations, one to Labeaume for the land included in Soulard's survey, and the other to Brazeau for the land at the foot of the mound, south of Soulard's survey ; two patent certificates were issued, one to Labeaume and one to Brazeau, for two different tracts of land; two distinct surveys were made in 1852—one for Labeaume, retracing the authentic Spanish survey of 1799, and the other for Brazeau, locating his reservation at the foot of the Big mound, according to the express calls of the deed of 1798 ; and on each of these surveys a patent issued to the parties respectively—one to Labeaume, in March, 1852, for the land in Soulard's survey of 1799, and the other to Brazeau, on the same day, for the land at the foot of the Big mound, south of Soulard's survey and stockade, where the respective parties had possessed for over half a century by a common boundary line, the one on the south and the other on the north of the stockade—West v. Cochran, 17 How. 403.

The patent to Brazeau of 1852 was in evidence in West v. Cochran, and it was held to be effectual to pass a title to plaintiff for the land south of Labeaume's tract at the foot of the Big mound, and that no title vested in plaintiff for any other land under that confirmation—pp. 412–16.

Two controlling propositions are established by the decision in West v. Cochran : 1. That the confirmation to Labeaume of 1810 was according to the recorded Spanish survey of Soulard for Labeaume of 1799—p. 412.   2. That the confirmation to Brazeau was to be located by an U. S. survey; that it was so located in 1852, and that the title vested in plaintiff at that time, according to that location, for the four by four arpents of land at the foot of the Big mound— pp. 412–13.

The precise effect of the two patents was determined in that case.  The confirmation to Labeaume was held to be for a tract of land defined by a recorded Spanish survey of 1799, and the title passed from the United States to Labeaume for

that specific tract of land on 26th February, 1806, by relation of the patent to the day of claim—Landes v. Brant, 10 How. 348, 370 ; West v. Cochran, 17 How. p. 412.

The new patent, issued in violation of law in 1862, on the confirmation to Brazeau, is for a portion of the same land confirmed to Labeaume in 1810, and is included within Soulard's survey for Labeaume of 1799 and the patent to Labeaume of 1852. This new patent is void, under the decision in West v. Cochran, 17 How. 412 & 417, for the reason that the court held that all the land within Soulard's survey of 1799 was granted by the United States to Labeaume by force of the confirmation of 1810 and the patent of 1852, duly issued under the acts of 1805 and 1807.

The first grant being complete and perfect under said acts of Congress, the second grant for a portion of the same land is absolutely null and void, and can pass no title to the plaintiff, the United States having previously parted with the title in due form of law—Magwire v. Tyler, 1 Black, 198, S. C. U. S. The Supreme Court of Missouri, in Mitchell v. Handfield, 33 Mo. 438, gave the true construction to the confirmtion to Labeaume, and to the decisions of West v. Cochran and Magwire v. Tyler.

As between these two titles, the elder one must always prevail at law or in equity—West v. Cochran, 17 How.; Mackey v. Dillon, 4 How.; LeBois v. Brammell, 4 How.; Magwire v. Tyler, 1 Black ; Mitchell v. Handfield, 33 Mo. ; Cage v. Danks, 13 Ann. La. R. 128.

A.—The new patent of 1862 is void for the further reason that the Secretary of the Interior had no power to annul a patent issued upon a final decision recorded more than ten years before, in the same case, by his predecessor in the same office.

The title to the land confirmed to Brazeau passed according to the provisions of the acts of Congress of 1805 and 1807, above referred to, and the power to locate it was expressly reserved to the executive department, there being no Spanish survey of the land ; and when that power was finally

exercised, and the patent of 1852 to Brazeau was issued, the decision was final, and cannot be reviewed by any executive authority—West v. Cochran, 17 How. 412–17; Magwire v. Tyler, 1 Black, 195; Mitchell v. Handfield, 33 Mo. 438; Lytle v. Arkansas, 9 How. 314; Haile v. Gaines, 22 How. 144; Bernard v. Ashley, 18 How. 43; Cunningham v. Ashley, 14 How. 377.

In such a case, the title under the confirmation to Brazeau has absolutely passed by the patent, and neither the Commissioner of the General Land Office nor the Secretary of the Interior have any power to recall the patent, or annul the act of his predecessor, or divest the title. Lott v. Prudhomme, 3 Rob. (La.) 293, and U. States v. Stone, 2 Wall. 535, hold: "But one officer of the Land Office is not competent to annul or cancel the act of his predecessor. This is a judicial act, and requires the judgment of a court."

" The decisions of a ministerial officer may be inquired into in a court of justice, and nowhere else. Congress itself is incompetent under the Constitution to destroy the vested right and title of a purchaser of the public lands"—Jourdan v. Barrett, 13 La. 43–4.

" The United States having parted with its title by a patent legally issued, and upon surveys legally made by itself and approved by the proper department, can never impair the title so granted by any subsequent survey or grant. The United States in such case is no longer the owner—Cage v. Danks, 13 Ann. La. R. 128; West v. Cochran, 17 How. 412; Magwire v. Tyler, 1 Black, 198.

B.—The plaintiff sold and conveyed the land within the said patent of 1852, in favor of Brazeau's representatives, to Louis V. Bogy by deed, and is thereby estopped from claiming the land under the same confirmation in another place. (See deed of John Magwire to Louis V. Bogy.)

To this same effect the Supreme Court of Missouri has decided in Magwire v. Vice, 20 Mo. 429; Magwire v. Tyler, 25 Mo. 433, and S. C. 30 Mo. 202.

The Supreme Court of the United States has held, upon

this identical title, to the same effect in the cases of West v. Cochran, 17 How. 412–17, and Magwire v. Tyler, 1 Black, 198; see also Burgess v. Gray, 16 How. 48, 65, and Stanford v. Taylor, 18 How.

*C.*—The title to the sixteen arpents of land at the foot of the Big mound, included in the patent to Brazeau of 1852, must be divested before the court can locate the same confirmation within the Soulard survey. Two titles to two different tracts of land cannot emanate under the same confirmation.

*D.*—The only title papers from Joseph Brazeau for the reservation are the deed from Brazeau to Labeaume of 1798, creating the reservation, and the deed of Brazeau to Chouteau of 1816, conveying the reservation. Under these deeds the Brazeau reservation cannot be located at any other place than at the foot of the Big mound, where the U. S. survey and patent of 1852 fix it. By the deed of 1798 Brazeau conveyed the whole of his grant of four by twenty arpents of land to Labeaume, and reserved for himself " four arpents of land, to be taken at the foot of the mound, in the south part of said land." Brazeau had a limekiln on this reservation, about two arpents south of Labeaume's stockade, and Brazeau had cultivated up to the foot of the mound.—4 Crui. Dig. by Greenl. 271–3 ; 2 Hill. on Real Prop. 352, §§ 134–7.

The decisions of the Supreme Court of the United States in West v. Cochran and Magwire v. Tyler, on this same title, adjudge this reservation to be located at the foot of the mound. In Magwire v. Tyler, 1 Black, 199, the Land Court found as a fact that the Brazeau reservation was located south of Labeaume's patent, at the foot of the Big mound, and the Supreme Court of the United States so expressly declares the fact to be on pp. 198–9.

The deed of Brazeau to Chouteau of 1816 does not convey any land within Soulard's survey for Labeaume, and the plaintiff has not produced any other title paper from Brazeau ; so that if there were any equity outstanding in favor of Brazeau for any land not described in this deed, the plain-

tiff has not shown any transfer of it from Brazeau. If Brazeau had acquired any land in Soulard's survey by the confirmation of 1810, he has never conveyed it to any one, and plaintiff has no title to it.

IV. The assent of the United States to the passage of the title for the whole of Soulard's survey is evidenced by the confirmation of 1810 and by the patent of 1852 to Louis Labeaume, whose actual possession in 1800 and in .1803 was proved up before the Board of Commissioners, under a claim filed by Labeaume on 26th. February, 1806. This evidence, by the patent issued in conformity with the acts of 1805 and 1807, is conclusive upon all parties, in all courts, as against all other inchoate claims for title to the same land. All these claims in favor of Brazeau or other persons became extinguished by the issue of the patent to Labeaume and have no standing in court, and no other person than the grantee, under the said acts of Congress, can be held by a court of justice to be entitled to the land—West v. Cochran, 17 How. 413, 417 ; LeBois v. Brammell, 4 How. 449, 461 ; Landes v. Brant, 10 How. 348, 370 ; Magwire v. Tyler, 1 Black, 195, 199; Haile v. Gaines, 22 How. 144, 160 ; Lafayette's Heirs v. Kenton, 18 How. 197 ; Bissell v. Penrose, 8 How. 317 ; Chouteau v. Eckhart, 2 How. 344; Strother v. Lucas, 12 Pet. 410 ; Bissell v. Penrose, 8 How. 344; Menard v. Massey, 8 How. 306.

V. The inchoate claim of Brazeau never had any standing in court as against the Labeaume confirmation under the Soulard survey.

Brazeau had no legal confirmation under the acts of Congress of 1805, '6, or '7, under which the confirmation to him purports to have been made, for the reason that no notice of his claim was filed by him according to the requirements of said acts of Congress, so as to give the Board of Commissioners jurisdiction of his claim. The Board of Commissioners of Missouri possessed only such powers as were conferred upon it by acts of Congress of March 2, 1805, February 25, 1806, and March 3, 1807. The first of these acts created

the board, prescribed its duties and jurisdiction, and the others only extended that jurisdiction to certain classes of cases that might be filed during the time as extended. By the 4th section of the act of 1805, 2d vol. L. & B. ed., p. 326, each claimant " shall, before the 1st day of March, 1806, deliver to the Register or Recorder of land titles, within whose district the land may be, a notice in writing, stating the nature and extent of his claim, together with a plat of the tract claimed ; and shall deliver to the Register or Recorder, for the purpose of having the same recorded, every grant, order of survey, deed, conveyance, or other written evidence of his claim," &c.

This notice of claim had to be filed, together with the documentary evidence of title, before the 1st March, 1806, which time was afterwards extended, as to certain claims, until the 1st July, 1808 ; and it was further enacted, that "if any person should fail to deliver such notice, or cause to be recorded such written evidence of his claim, 'all his rights' under the act should be void and forever barred"; and that no incom-plete grants, warrants, deeds, &c., which were not so record-ed, should ever be admitted as evidence in any court of the United States against any grant derived from the United States.

This grant to Brazeau was incomplete. The Board of Commissioners was a court of special and limited jurisdiction, not acting under a common law jurisdiction, but in pursuance of a statute of the United States. After the claims were thus filed and recorded, the board was authorized to act upon them, and not before. The 5th section of the act of 1805 confers the only power possessed by the board, in the following words : "To decide in a summary way, according to justice and equity, on all claims filed with the Register or Recorder in conformity with the provisions of this act," &c.

The power of the Board of Commissioners did not extend to all land in Louisiana or Missouri, nor could the board confirm lands except in accordance with law—2 How. 374; U. States v. Percheman, 7 Pet. 85, 90, and cases cited above.

Congress did not create this board for the purpose of making donations of land, but merely vested in it power to act on claims to land under incomplete grants, warrants of survey, and settlement rights, originating under the Spanish Government, which were actually presented, filed and recorded, and accompanied by a written statement of the claim, signed by the claimant, showing its nature and extent, and to be prosecuted afterwards by producing before the board evidence of actual possession in October, 1800, or on the 20th December, 1803, or for ten years prior thereto. The board had no more power to confirm land not claimed before it, according to the requirements of the statute, than a court of justice would have to enter up a judgment without any party before the court, without a writ or appearance. Such a judgment would be a nullity; and so an act of the board, confirming land to a man who is not a claimant, who has not filed any notice, or made any proof of possession, in accordance with the statute, is a mere nullity.

The jurisdiction that might be presumed in favor of the validity of judgments rendered in a court of common-law jurisdiction, will not be presumed in favor of special statutory courts. A court constituted as this Board of Commissioners was, and created for a special purpose, has no common law intendment in favor of its jurisdiction, but the facts necessary to show its jurisdiction under the acts of Congress must appear upon the record of the judgment of the board rendered by the board in the particular case.—Wilcox v. Jackson, 13 Pet. 449.

In Chouteau v. Eckhart, 2 How. 374, the court held that " the Board of Commissioners had no capacity to grant, but only to ascertain facts and report their opinions," and that " their power to examine did not extend to every description of claim."

These principles apply with peculiar force to the case at bar. Brazeau failed to deliver any notice of claim, or to do any act required by law, in order to procure a confirmation or give the board jurisdiction of his claim. The reason why

he failed to do so is apparent from the record in this cause; for Brazeau prior to May 9, 1798, sold all his interest in the reservation, by a verbal sale, to Pierre Chouteau (see the deed from Brazeau to Chouteau of 1816), and this verbal sale passed Brazeau's title and claim under the Spanish law to Chouteau.—10 Mo. 260; 4 Mart. (N. S.) 567; 7 Mart. (N. S.) 315; 3 La. 114.

Labeaume duly presented his notice to the Recorder, claiming, according to his Spanish survey, all the land within it, and filed the documentary evidence of his title with said Spanish survey, and had them duly recorded, thus complying with the law, and placing his claim before the board which was confirmed to him as defined by the Spanish survey of Soulard.

In the case of Strother v. Lucas, 6 Pet. 771–2, it was held that notice of the nature and extent of the claim must be filed, together with all the written evidence of the claim, and all persons neglecting to do so are forever barred. See also Strother v. Lucas, 12 Pet. 453–4, 458, and Bissell v. Penrose, 8 How. (U. S.) 333, 338. Brazeau never filed any claim before the board, and he had no claim for this land to file.

The act of 1805, § 1, authorizes confirmations to inhabitants who cultivated and possessed tracts of land on the 1st October, 1800. By § 2, the head of a family, 21 years of age, who had made an actual settlement on a tract of land, with the permission of the proper officer, &c., and who actually inhabited and cultivated the tract on the 20th December, 1803, might be confirmed. The act of 1807 authorizes, by § 2, a confirmation to be made to any resident of Orleans or Louisiana who had been in possession of a tract of land ten consecutive years prior to the 20th December, 1803.

Brazeau had no possession to support a confirmation under these acts of Congress, and he had no estate upon which the confirmation could operate. He had sold all his interest in the reservation to Pierre Chouteau before 1798, and the court below, in the former case of Magwire v. Tyler, 30 Mo., has found as a fact that Labeaume and his grantees have

been in possession of the premises within the confirmation and patent to him from 1798 to this day—Magwire v. Tyler, 1 Black, (U. S.)

VI. The plaintiff is barred by the statute of limitations and by the lapse of time.

The title having passed from the United States to Louis Labeaume on 26th February, 1806, and the said Labeaume and the defendants claiming under him having been in possession of the land from 1806 to 1862, when this suit was brought, the plaintiff cannot recover.

1. The title passed to Labeaume on the 26th of February, 1806—West v. Cochran, 17 How. 413 ; Landes v. Brant, 10 How.; Mitchell v. Handfield, 33 Mo.

2. The possession of Labeaume and his grantees was open, notorious, and adverse to all persons, from 1806 until 1862.

The commencement of various suits by the plaintiff for this land does not prevent the running of the statute of limitations. Each suit commenced by plaintiff before or since 1851, has either been .dismissed, or the plaintiff has suffered a verdict against him.

The possession for ten years prior to the 18th September, 1862, vests a perfect title in the defendants to the land—Biddle v. Mellon, 13 Mo. 335 ; Blair v. Smith, 16 Mo. 273 ; McNair v. Lot, 34 Mo. 300 ; Bollinger v. Chouteau, 20 Mo. 89 ; Keeton v. Keeton, 20 Mo. 530 ; Lucas act of 1847.

William Chambers, William Christy and Thomas Wright were innocent purchasers, without notice of any equities in favor of Brazeau, and for full value, before any U. S. survey had been made of the confirmation to Labeaume. In such a case the purchasers are protected against all pre-existing equities—LeNeve v. LeNeve, 2 W. & T. Lea. Cas. 116, 120, Am. ed.; Boggs v. Varner, 6 W. & S. 469 ; French v. Loyal Co. 5 Leigh. 627 ; Crockett v. Maguire, 20 Mo. 34 ; Lodge v. Simonton, 2 Penn. 439 ; White v. Carpenter, 2 Pai. 217, 253 ; Connecticut v. Bradish, 14 Mass. 291 ; Goundie v. Northampton Water Co., 7 Barr. 233 ; and McNair v. Lot, 34 Mo. 300–2.

The innocent purchasers for full value came into possession in 1816, and after they and their representatives have held for forty-six years, under warranty deeds conveying the land by a well known ambit, the plaintiff has filed this bill to correct the alleged mistake in Soulard's survey of 1799, and in the confirmation of 1810.

The plaintiff is barred of this relief by the great lapse of time. The land then was of no value; now it is worth five hundred thousand dollars. After more than half a century from the settlement of the original locations by the Spanish Government, with the consent of Chouteau and Labeaume, in the presence of Soulard, in 1799 and in 1803, on the ground, and after coterminous possessions by a boundary line for fifty years, and an adverse possession by innocent purchasers for forty-six years, it is too late to correct the alleged mistakes of 1799 and 1810—Piatt v. Vattier et al., 9 Pet. 416; Smith v. Clay, 3 Bro. Ch. 640; Kane v. Bloodgood, 7 Johns. Ch. 93; Decouch v. Saratier, 3 Johns. Ch. R. 190; Prevost v. Gratz, 6 Wheat. 481; Hughes v. Edwards, 9 Wheat. 489; Wilson v. Matthews, 3 Pet. 41; and the late case of Badger v. Badger, 2 Wal. (U. S.) 87.

All the witnesses who could speak of the transactions in 1799, or 1810, are dead, and it is not competent for the court to pass upon the transactions of the last century—Johnson v. Johnson, 5 Ala. 97, N. S.; Atkinson v. Robinson, 9 La. 396; Pye v. Jenkins, 12 Pet. 254; Bowman v. Wattle, 1 How. 193; 2 Sch. & Lefroy, 636; 17 Ves. 87; Mitchell v. Thompson, 1 McLean, 106; Crane v. Prather, 4 J. J. Marsh, 77; Picot v. Page, 26 Mo. 413; 4 Yerg. 97; 6 Yerg. 73.

Where an action at law would be barred, relief will be refused in equity—Miller v. McIntyre, 6 Pet. 67; Hunt v. Wickliffe, 2 Pet. 212; Peyton v. Smith, 5 Pet. 493–4.

*Glover* and *Krum, Decker & Krum*, for respondents.

I. The 16 arpents now claimed and now sued for were confirmed to Brazeau out of a claim of Louis Labeaume for 374 arpents, claimed by virtue of Soulard's survey for Labeaume,.

dated April 10, 1799.   The Board gave to Brazeau this confirmation of 16 arpents out of Soulard's survey for Labeaume ; they could give it out of nothing else ; there was no other claim before them.

The act of Congress conferring jurisdiction on the board forbid the board to confirm any land not embraced in Labeaume's claim.   See the " Act for ascertaining, &c., titles and claims to land," approved March 2, 1805 ; 2 U. S. Stat. at large, pp. 324 & 327 ; " An act respecting claims to land in the Territory of Orleans and Louisiana," 2 U. S. Stat. at large, pp. 440–1.

If the confirmation to Labeaume for 356 arpents gave him a title of any sort to so much land, the confirmation for Brazeau for 4 arpents to him gave him the same sort of title. So far the titles are equal.   But of what derivation ?  Whence does the title to the 4 arpents spring ?   Why, it comes out of the identical 364 arpents asked for by Labeaume in his petition for extension.   The Labeaume claim is, by the board, fixed and valued at 360 arpents.   Now of these 360 arpents (that being emphatically the claim of Labeaume as adjudged by the board) they gave Labeaume 356 arpents, and 4 by 4 arpents to Brazeau.   Are those 4 by 4 arpents part of the 360 ?   Of course they are.   Then where did they come from ? Why, from the very essence and substance of Labeaume's petition and Labeaume's survey.   Nothing can be plainer. The court may be supposed to use to Mr. Labeaume this language : " Here, Mr. Labeaume, your claim was good for 360 arpents, but it has embraced Brazeau's 4×4 arpents ; therefore we will deduct that from it—we will take them out of your 360 arpents."

If the 4×4 arpents were carved out of the 360 arpents because they had been included in them by Soulard's survey of Labeaume's extension, then it only remains to ascertain what effect the confirmation had.   The 4×4 are somewhere inside of Soulard's survey ; but what right did Brazeau get by the confirmation ?   We answer, he got an equitable title.

In Strother v. Lucas, 7 Pet. 769, it was held that a con-

firmation without a patent is an equitable right. The confirmation was conclusive only of the equitable right—Burgess v. Gray, 16 How. 63, 48.

The confirmation to Brazeau by the Commissioners was the adjudication of a "good title" to 4×4 arpents, reserved in his sale, to be located by survey—West v. Cochran, 17 How. 415. The same is held in Magwire v. Tyler, 1 Black, 195, where it is said Brazeau's reservation was 4×4 arpents, and his confirmation was for 4×4 arpents.

If Brazeau had any equity to the land in dispute, the granting of a patent and survey to another party cannot destroy his right—8 Mo. 94; 2 Bibb, 484; 6 B. Mon. 290; Bagnall v. Broderick, 13 Pet. 450; Pet. Cir. Ct. 496; Stephenson v. Smith, 7 Mo. 610; 1 Pet. 212; 9 Mo. 586–592; Huntsucker v. Clark, 12 Mo. 333; 18 How. (U. S.) 87, 44; 24 Mo. 132; 5 Rand. 479; Bodley et al. v. Taylor, 5 Cranch, 191; Taylor et al. v. Brown, 5 Cranch, 252; U. S. v. Hughes, 11 How. 567.

Surveys must be legally made—Brown v. Clements, 3 How. 650; Robinson v. Campbell, 3 Wheat. 212; Perry v. O'Hanlon, 11 Mo. 585.

Illegal acts of officers are not binding on parties—Groom v. Hill, 9 Mo. 322; 10 Mo. 763; 21 How. 228, 294; 11 Mart. 212; 20 How. (U. S.) 8; 5 How. (U. S.) 328; 5 Cra. 591.

In Hill v. Miller, 36 Mo. 97, Wagner, J., said: "Where a patentee obtains his patent by fraud, and with notice of an existing prior equity, he will be held trustee for the person equitably entitled." In May, 1862, Brazeau's claim was surveyed, meted out, and bounded inside of the claim of Labeaume—inside of the 360 arpents tract decided to constitute Labeaume's real extent of land, and in the same year patented to Brazeau's representatives. This survey was approved May 8, 1862; the patent was issued June 10, 1862. This survey and patent have opened the door to Brazeau's representatives to litigate the merits of their claim in the courts. In 1852 the Land Department at Washington had Brazeau's confirmation surveyed at the foot of the mound,

and patented there. The plaintiff never applied for such a survey, but protested against its being made there, and refused to accept the survey or patent certificate, and has ever refused to receive the patent. It would be very unjust to hold that, under such circumstances, the plaintiff is bound by these title papers; no law is produced showing he is.

II. The case is now presented of two surveys and two patents covering the same land, and the question arises, how shall the conflicting pretensions of the parties be disposed of? We insist that all natural and legal equities pertaining to the claims shall be considered. Every government survey is *prima facie* correct; but this rule can never settle this controversy. You are compelled to look behind and into the whole history of the case as soon as two surveys appear—McGill v. Somers, 15 Mo. 80; 8 Mart. 727.

See Bagnall v. Broderick, 13 Pet. 450; Berthold v. McDonald, 24 Mo. 126; Bryan v. Forsythe, 19 How. 337. In this last case a patent was issued subject to the right of third persons; afterwards the claim of a third person was surveyed within the patent, and it was held that the last survey controlled the prior patent. In such case, the patents which conflict are only *prima facie* evidence of title in the patentee. To the same effect, see 8 How. 317; 22 How. 339; 9 How. 421. It must be observed that in this case the defendants have no confirmation for the 16 arpents of land claimed by Brazeau. They have no equitable title to those 16 arpents; their confirmation was for other land, 356 arpents, all which they have received. Brazeau had no confirmation for any land confirmed to the defendants. There are no conflicting confirmations in the case. The conflict simply arises from the defendants procuring a survey and patent for Brazeau's confirmation. This is the fraud complained of. Labeaume seized and held what was not his own. Brazeau's right was established by the confirmation as valid (17 How. 403; 1 Black, 199); but until Brazeau had a survey he could not sue. No wrong was done Labeaume by Brazeau's survey. The survey now is of no other value to

28—VOL. XL.

him than to enable him to sue; he must show his right to recover independent of the survey. The new survey for Brazeau simply affords a remedy.

The power to issue the new survey is not to be questioned. The case of Cochran v. West, 17 How. 415, is conclusive. The survey of 1817 located the land of Brazeau above the ditch. Chambers assented to it as agent of Labeaume's assignees. All parties assented to it. It remained untouched down to 1848, over thirty years. No appeal was taken from it by any interested party, no clamor made against it until 1847; yet it was set aside by Mr. Stuart in 1852, at the end of thirty-five years, and the 16 arpents (4×4) of Brazeau patented to Labeaume's representatives.

The power to recall a survey for Labeaume is the power to recall one for Brazeau. As to the Brazeau patent, it was never accepted any more than the survey, and was recalled by the act of the Government; there was no need of cancelling it. It could not have been cancelled, because nobody named in it as grantee ever claimed it. Nobody ever set it up. It was refused from the first. It was a mere mistake, an error, never fully consummated; and in this condition was corrected, annulled, recalled, set aside—Magwire v. Tyler, 1 Black, 195.

Magwire protested against the location and contested it, asserting that his land was above the ditch; and he prosecuted his claim before the department to a re-survey and location until it was granted in 1862. A patent is a mere ministerial act; it is furnished by the United States when sealed. But if the defendant refuses it, the title does not pass. The Government may have done all it could to pass the title by sealing the patent; but the defendants did not accept, and the title did not pass—Stoddard v. Chambers, 2 How. 318. A patent issued against law is void.

III. All the equities in favor of Brazeau were secured by the form of Labeaume's patent. The patent did not purport to convey the land to Labeaume's representatives absolutely, but saved the rights of others. The words are, "saving and

reserving any valid adverse rights which may exist to any part thereof."

The plaintiff could not maintain ejectment in the condition of the titles—Stringer et al. v. Young, 3 Pet. 320 ; 4 How. 462.

It does not appear that the Supreme Court of Missouri has adopted the rule that the junior patent with the elder equity will maintain ejectment against the elder patent, save in respect to New Madrid claims. This is one ground of plaintiff's equity; another, is the cloud on plaintiff's title which the petition seeks to remove. In a conflict between parties on patented claims, when the courts go behind the patents, the patents do not aid the equity ; each must stand on its merits equitably, independent of the patents—Le Bois v. Brammell, 4 How. 462.

If any doubt exists as to the powers of the Land Department to survey the $4 \times 4$ for Brazeau, "An act for the survey of grants and claims to land," approved June 2, 1862, removes it—Sess. Acts of Cong. 1862, p. 410.

The survey in the case was finished May 1, 1862, but was not patented till June 10, 1862. The approbation of the survey by issuing a patent on it June 10, 1862, is an effective survey under the law. In 2 How. 318, it was held, that although a survey may not have been within the provisions of a law when made, yet if the patent on it issued within the provisions of the law, the title would vest—23 Mo. 100 ; 14 Mo. 585 ; Mills v. Stoddard, 8 How. 345–6. How could the patent on this survey be refused on the 10th June, 1862 ? The department was obliged to treat the survey as valid under the act of Congress of June 2, 1862.

IV. There is no plea in the answer such as is necessary to set up the defence of innocent purchaser without notice—Halsa v. Halsa, 8 Mo. 307–9; Boone v. Chiles, 10 Pet. 211. The patent was issued to Labcaume in 1852 ; until then the defendants had no legal title. This defence is never allowed in favor of the purchaser of an equitable title. The idea that defendants had no notice is untenable under the evidence in

the cause. Christy, Wright and Chambers concede in their deed the doubtful title to the 16 arpents. See their deed, May 4, 1816, book M, p. 34, and covenant for recovery on La-beaume. No improvements of any value, even to this day, were ever put upon the land.

The plaintiff purchased the 16 arpents at a public sale by Strother's administrator, in May, 1846, and afterwards obtained the title of the Marine Railway Company. He entered upon the land in September, 1846, and erected a boat-yard, and was carrying on the business of building steamboat hulls, and had a saw-mill on the ground which was burnt down.

V. The plaintiff never had any title upon which an action would lie until the commencement of the present suit—8 Wheat. 421 ; 10 How. 174; 10 Pet. 176 ; 9 Pet. 86; 7 Pet. 252 ; 8 Mo. 303 ; 17 How. 415; 1 Black, 199. This survey and patent for the land in dispute had not issued at the commencement of any suit heretofore brought by him.

Of course, the same title now in issue was never in issue and could never have been adjudicated in any former suit.

VI. The defendants have raised, in argument, a fifth point —that Brazeau's claim was lost by prescription prior to 1810.

To this there are several answers. 1. No action would lie on the claim till confirmed by the United States, it being an incomplete grant, and it could not be barred till plaintiff could sue. 2. No action would lie, certainly, till after the confirmation ; that has been the course of decisions in every suit brought by the plaintiff. 3. There is no proof of any adverse possession by any one; prior to 1810, of the 4×4 arpents above the ditch. 4. M. L. Clark testifies that Christy did not enclose the 4×4 in his fences, but left them out ; so Brazeau had no cause of action.

The confirmation of Brazeau to the 4×4 arpents is conclusive of his title at the time it was made.

In no event will this court reverse the finding on the evidence by the Circuit, as the evidence of location well justifies the finding below.

HOLMES, Judge, delivered the opinion of the court.

This is a suit in the nature of a bill in equity, filed in the St. Louis Land Court, in 1862, and removed by change of venue to the St. Louis Court of Common Pleas, praying the court to divest out of the defendants all the right, title and interest acquired by them in the tract of land therein de- scribed, and to vest the same in the plaintiff, and put him in possession ; and that an account might be taken of the rents and profits.

The petition sets forth the history of the plaintiff's title from its origin under the Spanish Government to its final completion in a patent from the United States in 1862.

The answer, in like manner, states the main facts in the history of the defendants' title from its origin under the former government to its final perfection in a patent, in 1852. Both patents include the land in controversy.

The grounds of equity stated in the petition are essentially these : 1. That the plaintiff has the better equity, and that the land justly belongs to him ; 2. That there was fraud on the part of the defendants, or their ancestors, in procuring a survey and patent to them for this land ; and 3. That the defendants' patent is a cloud upon his better title ; of all which the defendants had notice.

The answer denies these equities, and claims that defend- ants have the prior title and better equity ; pleads in bar a final decree in chancery in a former suit between the same parties, upon the same identical equities, and insists that the plaintiff's suit is barred by the great lapse of time.

The plaintiff obtained a decree that the title to said tract of land be divested out of the defendants and vested in the plaintiff and his heirs, and for rents and profits amounting to some $20,000, and the case comes up by appeal. The whole cause may be determined on a few essential points, without any necessity that we should discuss at large the immense array of facts and matters which are accumulated in the record, and which have been made the subject of elaborate argument on both sides, and been fully consid-

ered by the court. There are two patents for the same land; on the patents only there can be no question but that the elder patent conveys the absolute title from the United States, and consequently, if there were nothing more, the junior patent must be ineffectual and void for the reason that the grantor at the date of the patent was not the owner of the land, and had nothing to convey—Polk's Lessees v. Wendell, 9 Cranch, 79; Stoddard v. Chambers, 2 How. (U. S.) 318. The plaintiff, therefore, must claim, (as he does,) to go behind the patent into the history of the respective titles, in order to gain a prior or a better equity. The patents, respectively, relate back to the first or inceptive act, in the series of concurrent acts, which are necessary under the laws of the United States to complete the conveyance. It has been decided and may be considered as settled, that, under the acts of Congress on which these titles depend, the patent relates to the date of the filing of the claim—Landes v. Brant, 10 How. (U. S.) 373; Mitchell v. Handfield, 33 Mo. 438. Under this rule the defendants' elder patent relates to the 26th day of February, 1806, (when Labeaume filed his claim,) and vests an absolute title as of that date.

The plaintiff's junior patent cannot relate to any date prior to that of the confirmation of Brazeau, on the 22d day of September, 1810, for the reason that the record furnishes no evidence of an earlier date than that for the filing of his claim. On that day the Board of Commissioners takes notice of his claim and confirms it.

It does not appear that any claim had been filed or presented to the board, nor that any evidence of claim had been recorded, at any named date, in the name of Brazeau. If we could presume upon the facts of a confirmation appearing of that date, that all prior acts had been rightly done, there would still be no earlier date of the first act, to which the patent could be made to relate. The confirmation stands alone as the only inceptive act to which the fiction of relation can be applied in favor of this claim.

These first acts are the earliest equities that exist in favor

of the parties, and against the Government, of which a court of justice can take notice. They are the inception of the titles, as emanating from the United States. Prior to such inception there existed nothing but the unconfirmed claim or inchoate Spanish title by concession or survey ; and this was nothing more than an equity addressed to the political power under the obligation of the treaty. It has uniformly been held that where two conflicting equities of this nature have been acted upon by the Government, and one of them recognized to the exclusion of the other, there was an end of the matter in the courts of law or in equity. The decision of the Government is conclusive respecting the comparative merits of such inchoate claims. So far, then, the defendants have the prior title and the superior equity. There is no evidence in the record, other than the confirmation (and the certificate following upon it), that either Brazeau or Chouteau, his assignee, had made any claim before the board.

The Commissioners appear to have acted upon the evidences which were filed and produced by Labeaume in support of his own claim. They confirmed the claim of Labeaume upon those evidences, among which were a concession, a recorded Spanish survey, and proofs of an actual possession under them for many years, and the confirmation was to be surveyed mainly upon the *data* given in those evidences.

At the same time they confirmed "the four arpents" to Brazeau, agreeably to his reservation in the deed to Labeaume (which, together with the petition and concession to Brazeau of the tract of four by twenty arpents, was before them), and upon no other evidence that appears ; and this confirmation was to be located and surveyed upon the evidences of the reservation as made.

There is nothing to show that the board thought of confirming the same land to both parties. They had no power to do so. If the claims had been made for the same land, or conflicting evidences of right, it would have been their func-

tion, and their duty, to decide between them, and to confirm the one, and reject the other. This was certainly not done; they confirmed both. Now, that the claim of Labeaume, upon the evidence produced by him, included this land, there would seem to be no room for any rational doubt. The only evidence before the board relating to the claim of Brazeau, was the petition, concession and deed of Brazeau, which Labeaume had filed as a part of his own evidence, conveying to him the sixteen arpents of the length of the concession to Brazeau, in which deed only the reservation by Brazeau was mentioned, to consist of four arpents of the twenty in length of the whole concession, "to be taken at the foot of the hillock in the southern part of said land," which land, according to the petition, was "situate beyond the foot of the mound," and was to begin at the "foot of the hill" on which the mound stood, and by the concession was to "begin beyond the mound" and extend "north northwest to the environs of Rocky branch," and of which an end was to be bounded by the concession of Esther, which had no more fixed and definite location than had the concession to Brazeau.

It appears that the land thus reserved was sold by Brazeau to Chouteau. Neither Brazeau nor Chouteau had any possession of any land within the area of Labeaume's claim, as presented and confirmed. No evidence of the sale to Chouteau, nor any survey, or possession, or claim of either of them, appears to have been filed by anybody, nor produced before the board, in support of a claim for Brazeau. There is no reliable evidence whatever that the board intended to confirm to Brazeau any land within the area of Labeaume's claim and possession. His claim was evidently confirmed to be surveyed elsewhere. Therefore, even if relation were to be had for both patents to the date of confirmations only, thus making them equal in time, the plaintiff could gain nothing in respect of any superior inceptive equity to this land.

The defendants still hold that ancient possession as before,

and there would be no ground here, either at law or in equity, on which the plaintiff could be entitled to relief now, to the dispossession of the defendants.

Both claims were confirmed to be surveyed. The plaintiff proceeds upon the theory, not that the same land was confirmed to both claimants, but that the four by four arpents were confirmed to Brazeau to be surveyed out of Labeaume's claim, and within the area of Soulard's survey, and that only the remainder of the claim was confirmed to Labeaume. This whole matter becomes, essentially, a question of the location of the confirmations which were made to be located by survey on the evidences relating to them respectively. Labeaume's asserted claim was confirmed to him, though the entry in the proceedings of the board names a different number of arpents as the contents. The reservation of Brazeau was confirmed to him.

It necessarily follows, that, if the confirmation to Brazeau is to fall upon the same land as that of Labeaume, it must be the result of location and survey.

The larger part of the proofs, and much of the argument was directed to this subject, and really to the question of the true location of the reservation made by Brazeau ; and though not deemed absolutely necessary for the decision of the cause, it may be proper to say, that we are impressed with the justness of the conclusion of Napton, J., in Magwire v. Tyler, 25 Mo. 433, that this whole controversy " is purely one of locality"; that "pursuing it through all its ramifications, and looking at it in all its diversified shapes, it still resolves itself into this, and nothing else," and that "the United States Surveyor is alone to determine this question," subject only to the revision of his superior officers of the Land Office. Now the head of the Land Department had first finally determined this question in favor of the defendants, and given them the survey on which the elder patent issued, and that survey has never been set aside or annulled, nor can it ever be annulled—United States v. Stone, 2 Wal. (U. S.) 525.

We concur also in the opinion of Mr. Justice Catron, in West v. Cochran, 17 How. (U. S.) 411, that the entry of the confirmation of Brazeau in the records of the board "is so confused as to be unmeaning without reference to the title papers of the record," and also, (as we may add,) to the deed from Brazeau to Chouteau (which was not before the board), in which Brazeau himself recites more distinctly what land he had intended by that reservation.

We agree also with his opinion in Magwire v. Tyler, 1 Black. 199, that this confirmation to Brazeau (if ever to be surveyed at all) was to be surveyed "conformably to the reservation," and that "that reservation was at the foot of the mound." No competent surveyor, we think, could properly locate it otherwise than in conformity with this fixed land mark and controlling call. Nor could any competent surveyor, upon the whole given *data* relating to the location and boundaries of the confirmation to Labeaume, properly survey it, otherwise than so as to exclude the Brazeau reservation from within the limits of his claim, as actually possessed under the Spanish survey, and as presented to the board and finally confirmed.

But the executive officers have settled this matter of the location and it is no longer open to judicial inquiry; nor, if it would be considered open under any special circumstances (of which no supposable example occurs to us) for a consideration of equities, have we found any satisfactory evidence of a superior equity in this matter in favor of the plaintiff.

As bearing upon any supposed equity grounded upon fraud or mistake, a patient consideration of the whole history of the origin and progress of these titles has resulted in a thorough conviction, that all the fraud or mistake there has been concerning it, arose from the same "confused" entry, and that the idea of locating Brazeau's reservation within the area of Soulard's survey for Labeaume has never been anything else than an unfortunate blunder.

As regarding the inceptive rights to which the patents re-

late, for the purpose of ascertaining the priority of title as between the two patents issued upon different inceptive equities, the whole matter falls within the jurisdiction of a court of law ; and in that there is no need of invoking the aid of a court of equity—Ross v. Barland's Less. 1 Pet. 564 ; Landes v. Brant, 10 How. (U. S.) 373 ; French v. Spencer, 21 How. (U. S.) 228.

When the controversy has arisen between two conflicting inceptive rights only, before a patent has been issued to either party, or where one party stands on a prior inceptive equity, and the other on a junior equity and no patent, courts of equity have taken jurisdiction to protect the better equity, which had emanated from the Government. There are many cases of this kind concerning entries, pre-emption rights, and New Madrid locations, when the party stands in the position of a purchaser from the United States, for a valuable consideration paid. Even a right to have an entry by pre-emption where no money had, as yet, been actually paid, has been so protected as "a legal right" acquired under the acts of Congress. Such parties may be entitled to relief, against other persons than the Government itself, on the ground of fraud, or preventing a cloud upon a title, or multiplicity of suits, or injurious and unauthorized acts of public officers, or upon any other ground of ordinary chancery jurisdiction—Garland v. Wynn, 20 How (U. S.) 6 ; Barnard v. Ashley, 18 How. (U. S.) 44 ; United States v. Hughes, 11 How. (U. S.) 567 ; Carroll v. Stafford, 3 How. (U. S.) 441 ; Bodley v. Taylor, 5 Cranch, 191 ; Taylor v. Brown, 5 Cranch, 243 ; Huntsucker v. Clark, 12 Mo. 337 ; Berthold v. McDonald, 24 Mo. 131.

Courts of equity in this State exercise jurisdiction according to the principles of equity jurisprudence, excepting only as the same may have been modified by some special statute. Equities addressed to the political power do not fall within the scope of this jurisprudence any more than mere natural equities. There is really no case made on the record which can entitle the plaintiff to relief under any head of equity ju-

risdiction. The grounds of equity that are specially alleged in the petition consist, first, in a supposed priority of inceptive right; second, in the alleged fraud on the part of the defendants or their ancestors, which, so far as appears, consisted merely in a diligent prosecution of their claim before the several officers of the Land Department, resulting in a survey and patent to them for the land claimed, including the premises in dispute, in respect of which we find no proof of any fraud; and, third, in a supposed cloud upon the plaintiff's title, so created.

The matter of the inceptive right has already been sufficiently disposed of. The fraud alleged does not concern any contracts, relations, privities, obligations, trusts, agencies, or any transactions or conduct whatever, arising between the parties, respecting any right, title or property which had emanated from the United States, and in respect of which the plaintiff had acquired any prior or superior equity. Throughout the history of these claims the contending parties appear to have acted independently of each other, and pursued a separate struggle, to obtain the complete evidences of their respective titles, with conflicting pretensions, since the date of the confirmations, so far, at least, as any adverse claims to this same land have ever existed or been pretended. All such equities as may have existed in favor of either of the claimants under the former government and prior to the presentation of their claims for confirmation under the acts of Congress must be considered as merged and included in the equity or justice of the claims which were submitted to the action of the political power. And there is really no such thing in the case as what is meant in law by a cloud upon one's title. In one sense there is, indeed, a very heavy cloud, and not a cloud merely, but a thunderbolt of annihilation upon the opposing title.

Still further, this board had a limited and special jurisdiction only, and no more power than the act of Congress conferred upon them. They had power "to hear and decide, in a summary manner, all matters respecting such claims" as

had been filed upon " notice in writing," and been possessed or surveyed as required by the act of Congress, and of which the evidences had been delivered to the Recorder " for the purpose of being recorded," and upon no other claims of this class—act of Cong. of Mar. 2, 1805, 2 U. S. Stat. 326 ; act of Cong. of Mar. 3, 1807, § 7.

In such case all the facts must appear which are necessary to give jurisdiction, and show that the tribunal had authority to act and determine.   It appears that the board, *ex mero motu*, confirmed a claim for Brazeau, of which no notice in writing had been given, of which no possession nor survey had been proved, and of which the evidences had neither been filed nor recorded, and were not produced by any one in the name of Brazeau.

We must hold that they had no jurisdiction, no power to act upon such a claim, and that the confirmation to Brazeau was a nullity.   The plaintiff's patent is therefore null and void both in its inception and its completion—Grignon's Less. v. Astor, 2 How. (U. S.) 341 ; Chouteau v. Eckhart, 2 How. (U. S.) 374; Bissell v. Penrose, 8 How. (U. S.) 338; Landes v. Perkins, 12 Mo. 255 ; Patterson v. Fagan, 37 Mo. 81.

The plaintiff's survey shares the fate of his title, and must fall with it, whether that title fails for the reason that the land had been previously surveyed and patented to another upon a prior inceptive right, or upon the ground that it it was void in its inception. If the plaintiff had shown a foundation for equitable relief under any recognized head of equity jurisprudence, it would not matter whether he had the legal title to this land or not.   One legal title is enough. In such case the court would decree the title to be conveyed to him or to be vested in him by decree.   His equity alone would be his sufficient title to relief.

The former decree in chancery between these parties proceeded upon the same substantial facts and grounds of equity that are here alleged again.   The only essential differences that are insisted upon now, are, that when the former cause was litigated, the official survey and patent had located the

plaintiff's claims in another place, and that he has now a formal title, by patent to this land, which he did not have then. This may be true, but it cannot change his situation in reference to any equities upon which he might be entitled to relief. In this matter of the legal title, his complaint really concerns the priority of the title, or the action of the Government, over which the courts have no control. It has been shown that the plaintiff's patent is wholly inoperative and ineffectual, for the reason that the grantor did not own at the time any right, title or interest in the land on which it could have effect, even if not otherwise void; and further, that it is utterly void from its inception, for the reason that the confirmation was void; consequently, he has no more legal title now than he had at the date of the former suit. The equities are substantially the same as before, and the same matters were then adjudicated. The former decree is therefore a complete bar to this suit—Parish v. Ferris, 2 Black, 606; Perine v. Dunn, 4 J. Ch. 140; 2 Sto. Eq. Jur. § 1523.

The great lapse of time and the statute of limitations have been urged upon our consideration. On this it will be enough to say that the defence, resting upon a Spanish possession under a concession and recorded survey, and continued to the present time under an absolute title from the United States dated from the year 1806, needs no help, and could derive no additional strength against the plaintiff here from any statute or limitations.

The judgment will be reversed and the petition dismissed. The other judges concur.