Napton, judge,
delivered the opinion of the court.
This was a bill in chancery. Clark, the complainant, states in his bill, that in the fall of 1842, one Jones had improved the S. W. qr. of S. 23, T. 56, R. 34, then being public land, and subject to pre-emption under the laws of the United States, and that Huntsucker, the defendant, was residing on the N. W. qr. of the same section, to which he had a pre-emption, and had also cleared and cultivated two or three acres on the first mentioned quarter; that the complainant, being a stranger, and desirous of purchasing land, was making inquiries in this neighborhood, when Huntsucker applied to him, and urged him to purchase from Jones the said S. W. qr., assuring him there would be no difficulty in getting a pre-emption, and securing a valid title; that the complainant accordingly contracted with Jones for his interest in this land, but before the contract was consummated he learned the fact, heretofore stated, that Huntsucker had in cultivation two or three acres upon this quarter; he therefore went to Huntsucker, informed him of what he had heard, and that this improvement might give him a preemption right, when said Huntsucker assured him that he had no claim whatever to said quarter, that he had no intention of setting up any preemption by virtue of his little improvement upon the same, if he had any ; that he did not expect to be able to secure more than the quarter section on which he resided. Said Huntsucker, however, expressed a wish to continue the cultivation of the two or three acres thus cleared and fenced by him, on the said S. W. quarter of 23, until the produce of it should remunerate him for his expense and labor in fencing and clearing it, to which the complainant assented. The assurances of Huntsucker that he had no valid claim to this quarter, and that if he had, he would never assert it, or interfere in any way with Clark, the complainant, were repeatedly and distinctly given, and he was urged to purchase of Jones. The purchase was made from Jones for one hundred dollars, and the complainant took possession.
Subsequently this land, and the quarter section on which Huntsucker resided, was selected as State land, under the act of Missouri, February 27th, 1843. Clark, the complainant, settled in the S. W. quarter of 23, which he hadboughtof Jones, being the head of a family, and erected a dwelling house, and made other improvements, and on the 15th Oct., 1845, he applied at the land office at Savannah, in Andrew county, and proved up his pre-emption under the law of March 13th, 1845, *336 and received his certificate. Afterwards, in the same month, Huntsucker had him notified that on a day named he would appear in the land office and claim his pre-emption by virtue of his cultivation prior to Clark’s. Huntsucker did make the application, and obtained the certificate, and threatens to get the patent.
The bill prays that the court will compel Huntsucker to assign the certificate to complainant.
The answer of Huntsucker denies all solicitation on his part to induce the complainant to purchase, and states the fact to be that he, the respondent, had his dwelling house and improvements on said S. W. qr. of 23, and about seven acres in cultivation, although the principal portion of the farm was on the N. W. qr. of said section; that after the complainant had bought of Jones, he, the respondent, told the complainant that if he would secure him twenty-five acres, embracing his improvements, he would set up no claim to said S. W. qr., but the complainant refused. This was offered by way of compromise. The answer is long, and denies every allegation of the bill tending to show any fraud on his part.
The evidence in the case showed that Huntsucker settled in the neighborhood in 1840, before the land was surveyed, and that his dwelling house, and about five or seven acres of his farm, fell on the S. W. qr. now in controversy ; that the larger portion of his farm was on the N. W. qr. and that he always declared his intention to claim the latter by pre-emption, and that he frequently expressed the opinion that this quarter would be as much as he would be able to pay for. Before Clark’s purchase he had commenced a new house upon this N. W. qr., but did not remove from his old house on the S. W. quarter, until after the purchase of Clark from Jones. One or two witnesses were introduced by the complainant, who related statements made by the defendant after the controversy between him and complainant in the land office, and after this bill was filed, in which Huntsucker gives a statement of the conversation between him and Clark, corresponding very much with the charges in the bill. Huntsucker admitted in these conversations, according to one witness, that he told Clark he wanted the land on the S. W. quarter to a certain branch, about twenty-five acres, but Clark refused to make any such arrangement; that he afterwards proposed to Clark to abandon all but the seven acres he had improved, but Clark declined this, and said he would not buy unless he could get the whole quarter, whereupon Huntsucker told him to buy. Several witnesses proved that Huntsucker had disavowed to. them all pretentions to *337 the S. W. quarter, upon the ground that he designed claiming the N. E. quarter, and that this would be as much as he could pay for. One witness was present at a conversation between Clark and Huntsucker, just before Clark purchased of Jones, or immediately after, and, in this conversation, Huntsucker told Clark he wanted the piece of land up to the branch, (heretofore spoken of,) but Clark told him he could not make any contract with him, but was willing to make satisfactory arrangements after he purchased.
The circuit court made a decree in conformity to the prayer of the bill, and from this decree the defendant has appealed.
The principal objection to the decree in this case, is based upon a supposed assumption of jurisdiction by the court. It is contended that a court of chancery has no revisory jurisdiction over the decisions of the register and receiver, and therefore as these officers have given the certificate of pre-emption to the defendant, Huntsucker, the courts cannot disturb this decision. This position is maintained upon the authority of Lewis vs. Lewis, (10 Mo. R. 183.) That was a case arising under the pre-emption laws of the United States. Those laws, having required rights of pre-emption to be proved before certain officers, and to the satisfaction of those officers, it was thought that the courts had no right to interfere They could not determine that a pre-emption under the acts of congress belonged to one person, when the officers selected by congress to determine this matter, had decided that the right was in another. But it was not held, in that case, that if, under the pre-emption laws of the United States, a pre-emption right was secured by fraud, or breach of trust, a court of equity would not afford redress. It was intimated that in such cases it might be premature to interfere with the incipient title, but it was not doubted that our courts would not suffer a title acquired through fraudulent practices from the officers of the federal government, to avail the owner, any more than they Would protect such a title when acquired from a private individual. The case of Cravens vs. Bird, (1 Mo. R.) was an instance of the interference of our courts in a case of this character. Such interference does not proceed upon any assumption of a right on the part of the courts to revise the determination of the federal officers, but it is based exclusively upon an undisputed jurisdiction incident to all courts of equity, over the subject of trusts and fraud. The officers of the federal government, to whom is entrusted the sale of the public lands, have not been invested by congress with any judicial power, and questions of this character, if examined by them at all, cannot be settled definitively by these minis *338 terial officers. Such questions must be left to the judicial tribunals, and their determination does not involve any interference with that primary disposition of the soil which the compact between the federal government and this State has reserved to the former. It may be doubted, however, whether any question of this character -could arise under the acts of congress securing pre-emptions to actual settles. Under all the •latter acts on this subject, such claims were not transferable. The privilege was confined to the settler alone, and it was not a privilege which he could transfer to another. No such fraud, therefore, as is charged to have been practiced by the defendant in this case, could have existed under the federal pre-emption laws. But the laws of this State, which have secured pre-emption to those who previously were entitled to them under the acts of congress, and to suck subsequently acquired rights as. are provided for in this act, have expressly declared these claims to be transferable, and have provided the mode of assigning them. The 13th section of the act of February 27th, 1843, declares that “ all pre-emption rights under this act shall be transferable, an.d certificates of purchase money be transferred or assigned, and patents may issue in the.name of the assignee.” In this respect, pre-emptions under our State laws are materially different from pre-emptions under •the laws of the United States. But there is another peculiarity in our law, arising out of the above provision, which restricts the powers of the State officers in deciding upon applications for pre-emptions. The 14th section of the act above referred to, provides that “when two or more persons claim pre-emptions on the same land as heretofore selected, or which may be hereafter selected, the right shall be deemed to be in him or her who shall have made the first settlement on said land, to be decided by the register and receiver of the proper land office; provided, that this section shall not be so construed as to apply to any case where the person who made the first settlement has transferred or sold his interest in or to said land, but in such case the right of pre-emption shall •vest in the person then in possession of the same. ” The register and receiver are then governed by the first settlement, except where there has been a transfer or sale. It is apparent that these officers were not entrusted with any equitable jurisdiction; that they had no authority for investigating the circumstances upon which the present complainant relies for a title. The exercise of this jurisdiction on the part of the courts, presents no conflct of power, no assumption of any revisory control over the action of the executive officers but is based upon the supposition that these officers have discharged their duties correctly. *339 It was clearly never intended that the register and receiver should constitute a court of equity, and have power to determine that the first settler, although he had neither assigned nor transferred his pre-emption, was yet to be- regarded as a trustee for some other person, who by reason- of the trust was the equitable owner. Such questions belong properly to a judicial tribunal.
The difficulty suggested in the case of Lewis vs. Lewis, of a premature interference with the title before a patent has issued, will not arise under our laws. The pre-emption right *or certificate is treated under our law as a vendible-title. The patent is by law directed to be issued to the person, having the certificate, whether acquired by settlement or by purchase. The transfer of a certificate by a court of equity would place the assignee in a condition to obtain the title, and the action of the court would not be arrested upon a vague-apprehension that the law would be violated by an executive officer. Under the federal pre-emption laws, a transfer of the privilege was treated as a fraud upon tho law, and was express!]" prohibited. Of course the patent issued to the pre-emptor, and to him alone. If the courts then undertook to make a transfer of the certificate of purchase, it could only be on the ground that the right of pre-emption had been wrongfully adjudged by the officers to whom the government had entrusted the duty of deciding upon these claims. But as the title still remained in the government until the issuance of a patent, its officers might choose to disregard the decision of the courts, and give the patent to the person to whom the subordinate- officers had given the certificate.
This is. a case, then, in which we think the courts have a clear jurisdiction, and it only remains to be considered whether the facts stated in the bill present a veritable case for its exercise. The general principle which governs cases of this character is well established. Where a man suffers another to expend money upon land under an erroneous opinion of title, without making known his claim, he shall not after-wards be permitted to- assert it; or where a person having a right to an estate, permits or encourages a purchaser to buy it of another, the purchaser shall hold it against the- person who has the right. It is a kind of equitable estoppel. The conscience of the person who thus encourages another to expend his money, under an erroneous impression which could be readily removed, is bound, and it would be promoting fraud and injustice to permit him to set up such claim. Wendell vs. Van Rensaeller, 1 J. Chr. 353; Reilly vs. Miami, Ex. Co.; 5 Ohio, 333 ; Buckingham vs. Dille, 10 Ohio, 288; Carter vs. Longworth, 4 Ohio, 384. *340 But it is said that the defendant Huntsuclcer did not conceal his title, but merely promised not to assert it; and that this promise can only form the basis of an action for damages. The case, as disclosed in the bill, comes clearly within the spirit and meaning of the general rule we have alluded to. It is not literally a case of concealment of title, for the defendant had no title to conceal. The title to the land was, at the time of the alleged conversation between the parties, in the United States, and has since been transferred to this State. But it will be seen that the representations' of Huntsuclcer, if we take them to be as described in the bill, had the effect of misleading the complainant, and inducing him to eypend his money upon land to which the defendant had a pre-emption. It is true that the bill concedes that the complainant was apprised of Huntsucker’s claim, hut he must have known that his claim presented no obstacle to his purchase if Huntsucker had no design of entering the land. Whether this was the intention of Huntsucker or not, was known only to himself, and to advise the complainant to buy was equivalent to a renunciation of any preference he had in the purchase. His title, if the phrase be admissible, depended on his intention, and a concealment or misrepresentation of his intention was virtually a concealment of his title.
But little was said in the argument at the bar in relation to the weight of evidence. There is certainly no direct proof of any encouragement on the part of Huntsucker to this purchase of the complainant, but the circumstances are very strong to show that Huntsucker acquiesced in the unconditional purchase after failing to procure a promise from the complainant for a title to a small portion of the quarter section.
The testimony is decisive that Huntsucker, previous to the treaty between Jones and the complainant, had determined upon purchasing the quarter section upon which the larger portion of his farm was located, and upon which he was engaged in erecting new buildings for the accommodation of his family. This determination was repeatedly avowed to his neighbors. He admits, also, that he was aware of the negotiation between Jones and the complainant, and, although he denies that he encouraged the purchase, he admits that he did have conversations with the complainant on the subject. He admits that he consented that the complainant should purchase, but only on the condition that he was to receive a title for some fifteen or twenty acres, embracing the land upon which his first houses stood. Besides the fact that there is no witness to prove this conditional assent, there is one witness asserting positively to his own admission that Clark would not consent to such an *341 arrangement. Probabilities would certainly favor the statement of the witness, and the other facts, clearly proved, go to confirm an unconditional assent. We shall therefore affirm the decree.