Mary P. KRUMMENACHER (Plaintiff),
Respondent,

v.

EASTON–TAYLOR TRUST COMPANY,
Defendant,

and

Edwin A. KRUMMENACHER, Administrator of the Estate of Mary Krummenacher, Deceased (Defendant), Appellant.

No. 29738.

St. Louis Court of Appeals.

Missouri.

Nov. 5, 1957.

Motion for Rehearing or to Transfer Cause to Supreme Court Denied Dec. 2, 1957.

Finley, Lucas & Arnold, Ralph T. Finley, St. Louis, for appellant.

Coburn & Croft, Richmond C. Coburn, Frank E. Booker, St. Louis, for defendant.

Adolph K. Schwartz, St. Louis, for respondent.

HOUSER, Commissioner.

Mary P. Krummenacher and Mary Krummenacher (hereinafter referred to respectively as "Mary P" and "Grandma") held certain funds in a joint savings account in Easton-Taylor Trust Company in form payable to either or the survivor. Grandma died. Mary P claimed the proceeds of the account as the survivor and brought suit therefor against the trust company, which had refused to pay in view of the rival claim of Grandma's administrator. The administrator was ordered joined as an additional party defendant. The trust company paid the sum of $5,087.68 into the registry of the court and was discharged, thus leaving the rival claimants to litigate their respective claims. The cause was tried to the court without a jury. The court found the issues for Mary P for $4,737.68 (the amount remaining in the registry of the court after payment of an allowance to the attorneys for the trust company). The administrator appealed.

The petition of Mary P alleged the joint deposit in form payable to either or the

survivor, the death of the co-depositor, Mary P's right as the survivor to the sole and absolute ownership of the funds on deposit, demand and refusal of the trust company to pay.

The second amended answer and cross-bill of the administrator alleged that all of the money deposited in the account belonged to Grandma and none to Mary P and denied that Mary P became the owner of the funds as the survivor of Grandma. The administrator affirmatively alleged that there was a fiduciary relationship between Mary P and Grandma, who was 78 years of age when the contract of deposit was entered into; that the joint account was made with the agreement and understanding between Mary P and Grandma that the latter would deposit said funds in the joint account "for the use and benefit" of Grandma and that Mary P would not withdraw from said account except by checks payable to Grandma; that Mary P agreed to withdraw all or any part of the joint account "whenever requested" by said Grandma; that in the event of Grandma's death Mary P would pay the funds to the personal representative of Grandma's estate; that said joint deposit was made only for "security reasons" and not for the use and benefit of Mary P; that it was not the intention of the parties at the time the account was established, or thereafter, that any of the funds go to Mary P; that in Grandma's 90th year she sought to have Mary P withdraw the funds in the joint account; that on the day she was requested to do so Mary P falsely stated that the bank was closed for business for the day when in fact it was open; that on the next day Mary P refused to sign a withdrawal slip; that in the exercise of undue influence existing by reason of the fiduciary relationship and acting upon the fear that to insist upon the withdrawal would antagonize Mary P and would prejudice Grandma's chances of collecting certain notes and interest owed to Grandma by Mary P, and upon the latter's promise to transfer the funds to Grandma

at a later date, Mary P prevailed upon Grandma to agree to a delay in the withdrawal of the funds; that although requested thereafter several times to transfer the funds Mary P neglected to do so, thereby deliberately preventing and deferring the transfer of the funds until Grandma's death; that Mary P falsely told Grandma that it would not be safe to send the funds to the city to which Grandma was moving, intimating that the latter's son would keep said funds from the estate and from Grandma's heirs and particularly from her daughter Amelia; that Grandma, who was then in her 90th year, became ill, weak and unable to sign her name; that by these means Mary P "falsely and fraudulently kept the said Mary * * * from obtaining said funds before her death, and thereby breached her contract and agreement with the said Mary * * *;" that the administrator is entitled to the funds as the legal representative of the deceased; that in equity and good conscience Mary P has no interest in the funds; that at all times after depositing the funds and at many times following Grandma's death Mary P had stated that she did not own or claim the funds and would pay them to Grandma's estate as soon as a representative was appointed, but that she failed to do so, bringing this suit instead. In his answer the administrator prayed for an order to turn the funds over to him "as damages" or in the alternative that the court declare that Mary P has breached her trust as co-depositor. In his cross-bill the administrator prayed that the court find that the joint account, in equity and good conscience, belongs to Grandma's estate; that the court declare a resulting trust in the administrator; that the contract of deposit be set aside and cancelled because of Mary P's fraud and undue influence over the mind of Grandma; that the court declare that Mary P by reason of the fiduciary relationship wrongfully and fraudulently sought to obtain the funds for her own use and benefit contrary to the understanding between Grandma and Mary P, and that in the alternative the court enter a declaratory

judgment defining the rights of Mary P and the administrator in "said trust funds" and for general relief. Mary P's reply was a general denial of all new matter in the answer and cross-bill.

Plaintiff's case consisted of a stipulation by counsel to the following facts: that a bank account was opened at Easton-Taylor Trust Company on January 4, 1944 in the joint names of Mary P. Krummenacher and Mary Krummenacher pursuant to the following instrument, which was signed in the genuine handwriting of the signatories as indicated:

"1 Mary P. Krummenacher Number
2 Mary Krummenacher 8886

The Rules, Regulations and By-Laws of the Easton-Taylor Trust Company St. Louis Savings Department, are agreed to by the Undersigned:

1 Signature /s/ Mary P. Krummenacher
2 Signature /s/ Mary Krummenacher

| | 1 | 2 |
|---|---|---|
| Address | 5309 Cabanne Ave | 720 N. Main St. Highland, Ill. |
| Birthplace | Denver, Colo. | Argan—Switzerland. |
| Mother's or Father's name | David T. Putman | L. Bircher |
| Wife's or Husband's Name | Widow | Widow |
| Your Occupation | President—Corporation | Tailoring |
| St. Louis, | Date 1944 | |

(reverse side)

Co-Depositor Clause

To The Easton-Taylor Trust Company of St. Louis:

All moneys now on deposit, or at any time deposited by us, with the Easton-Taylor Trust Company of St. Louis to the credit of the above account, are and shall be so deposited by us and received by The Trust Company upon the following terms and conditions of repayment, viz.:

That the amount thereof and all interest thereon, shall be paid by the Easton-Taylor Trust Company of St. Louis to us or either of us, or to the survivor of us, or to the executors, administrators, or assigns of such survivor, or upon the written order of any person so entitled to payment; and without reference to the original ownership of the moneys deposited.

In the case of the death of either or both of us, further repayment shall at the option of the Easton-Taylor Trust Company, of St. Louis, be conditioned upon the production of evidence that all the inheritance and estate taxes—if any be due—have been paid, and that all other provisions of law in such cases provided have been fulfilled.

Signature /s/ Mary P. Krummenacher
Signature /s/ Mary Krummenacher

St. Louis, Mo., Jan 4 1944
Witness:"

that Mary Krummenacher (Grandma) died on October 8, 1954 and that Mary P. Krummenacher (Mary P) was living at the time of Grandma's death and is still living.

The administrator's case consisted of oral and documentary evidence tending to establish the following facts: Mary P is the wife of Victor Krummenacher. (The exact relationship between Victor and Grandma's deceased husband is not shown.) Mary P and her husband live in St. Louis. Grandma lived at Highland, Illinois in 1944 when the joint account was established. Grandma, a European, came to this country from Switzerland. She spoke German, Swiss "and very broken English with quite a mixture of her own 'tongue' in it." There is no evidence as to the condition of her health in 1944. She was then 78 years of age. Mary P told Grandma's daughter-in-law Mabel Krummenacher, and "all seemed to take it for granted" that Grandma's money was used to establish the joint account. "The whole family understood" that the account was opened "to protect Grandma's money." Grandma referred to it as "my money" and Mary P referred to it as "Grandma's money" or "her money." On numerous occasions between 1944 and 1954 Mary P told Grandma's son Edwin and his wife Mabel that the joint account was Grandma's money and that in the event of Grandma's death Mary P expected to turn the money over to Edwin. (The account was inactive, there having been only two deposits, other than interest accruals, and no withdrawals during the ten years the joint account was in existence prior to Grandma's death.) On October 1, 1953 Mary P signed a promissory note payable to Grandma in the sum of $2,000. A second such note dated April 1, 1954 in the sum of $1,000 was offered in evidence. Neither bore endorsement of any payment of principal or interest. In the spring of 1954, in her 89th year, Grandma wrote Mabel asking her to come to Highland and help "break up" her home and take her to Dallas, Texas, there to make her home with Edwin and Mabel. Mabel went to Highland for that purpose. At Grandma's request Mabel telephoned Mary P at St. Louis and asked her to "talk to the bank" about withdrawing money in the joint account. Mary P called back in a day or two stating that "the bank said that any time Grandma wanted her money she could have it." Mary P went from St. Louis to Highland to help Mabel and Grandma pack. Mary P brought them back to St. Louis for a few days' visit before returning to Dallas. Grandma stayed at Zella Krummenacher's house for a few days and then at a hotel. Grandma, who had possession of the deposit book issued by the trust company, handed it to Mabel to obtain the funds. On a certain day in June, 1954 Mabel broached the subject but Mary P said, "I am not going to the bank; besides, they close early today." That statement was made about 12:40 or 12:45 p. m. The trust company was open for business that day until 2 p. m. On the same afternoon Mabel and her friend Louise Murphy went to the trust company and procured blue withdrawal slips from the savings department in order that Grandma could sign a withdrawal slip herself. When they returned to the hotel they found Mary P with Grandma. Both were in an excited state of mind. There was "plenty of friction" in the air. Mary P and Grandma were "real close—you couldn't hardly get a straw between them, and Mary whispering to her real confidential." They heard Grandma say, "But Mary, I must have my money." When Louise spoke to Mary P the latter "jumped up in a rush," screamed at her, shook her finger in her face and said, "I am not signing that withdrawal. * * * Grandma don't want me to do it now. * * * Grandma doesn't want her money and I am not going to sign anything. * * * When you take Grandma to Dallas I will take care of it. * * * I will send her money to Dallas." After whispering to Grandma Mary P said, "Honey, you don't want me to do that, do you?" When Grandma heard Mary P say she was not going to sign the withdrawal slip she "got all excited" but said very

little after that. Mary P left the hotel and after Mabel and Louise got Grandma calmed down Mabel asked Grandma "Why don't you get your money if you want it?" Mabel suggested that Grandma sign a withdrawal slip herself. Grandma was "concerned to get it, but she wouldn't sign the little withdrawal slips." Grandma said that she was afraid; that she did not want to make Mary P mad because then she would not pay the interest due on her notes. Grandma said, "I will make Mary mad if I ask her for it; she will send it to me in Dallas." Grandma was very feeble when she left Highland. After she moved to Dallas a doctor examined her and said that she was "very weak." She was not robust. She could not see or hear well, was forgetful and would not take her medicine. Approximately two months after the move to Dallas Grandma became very uneasy about the money. She wanted to know why Mary P "didn't come with the money," constantly wanted to be assured that she still had possession of the bank book and repeatedly stated that Mary P owed her interest. She would not talk about anything else. Finally Edwin called Mary P long distance in order to give Grandma an opportunity to discuss the money. After they got Mary P on the line Grandma would not talk on the telephone. Mabel had never known Grandma to use a telephone. Edwin then told Mary P that his mother wanted the money. Mary P agreed to send a check to the Highland Park State Bank where Grandma had an account, but she did not do so. Grandma died on October 8, 1954. The next to the last thing she said, just a second before she died, was "Mary and the money." At the time of her death she was 90 years of age. A letter written by a Dallas bank, indicating that $1,000 owned by Grandma was placed in a joint account in the names of Grandma and Mabel and that after Grandma's death the money was turned over to Edwin as administrator, was offered by the administrator. A letter written by a Dallas doctor concerning his examination of Grandma, "what ailed her," his treatment and the cause of death was offered in evidence.

Edwin was appointed administrator of his mother's estate. Edwin's lawyer, Ralph T. Finley, inquired of Mary P if she had any interest in the joint account. Mary P told Mr. Finley that she disclaimed any interest in the account other than to see that "it goes to the right people" upon the death of Grandma, and that she would pay it to the "executor" as soon as he was appointed. Two lawyers who at different times represented Mary P told Mr. Finley that their client "doesn't claim the money" and that they would advise her to make a check payable to the administrator and send it to him. This was never done. Instead Mary P filed suit against the bank.

Taking the position that under Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817, and Connor v. Temm, Mo.App., 270 S.W.2d 541, parol evidence is inadmissible to vary the terms of a co-depositor contract made pursuant to Section 363.740 RSMo 1949, V.A.M.S., the trial court made rulings excluding most of the evidence offered by the administrator. In making his findings and announcing his decision, however, the trial judge took into consideration and reviewed the evidence. The court found "from all this evidence" that Grandma had capacity to contract and that she was operating under no physical or mental disability; that there was no fraud, misrepresentation or fiduciary relationship either in the making of the contract or thereafter; that the breach of a promise to do something in the future (withdraw the funds and send them to Grandma) will not support an action for fraud; that Grandma could have withdrawn the funds at any time; that the ownership of the deposit was fixed at the time the contract was signed, and that the title to the funds, upon the death of Grandma, passed to Mary P.

On this appeal the administrator complains that the court erred in excluding parol evidence to support the theory of a fiduciary relationship, fraud and undue

influence; erred in failing to find the existence of such a relationship and that Mary P was guilty of fraud and undue influence in preventing and postponing the transfer of the funds, and that in equity and by reason of Mary P's admissions against interest the administrator is entitled to the funds in question. The administrator contends that a fiduciary relationship existed both before and after the establishment of the joint account and that he is entitled to the funds not only on the theory of fraud but also on the theory that he is the beneficiary of a constructive trust.

 Commerce Trust Co. v. Watts, supra, announced the rule that parol evidence is not admissible to contradict or vary or show an intention of the parties contrary to that expressed in an unambiguous joint deposit contract, in the absence of fraud, duress, mistake or mental incapacity. There were sufficient allegations of fraud and undue influence in the administrator's second amended petition and cross-bill to bring the instant case within the exception noted in Commerce Trust Co. v. Watts, supra, and to render parol evidence of fraud admissible. But we need not decide whether the court erred in its several rulings upon the various items of evidence offered by the administrator. Conceding (only for the purposes of this opinion but not deciding) that every such item of evidence was admissible and was true in fact there was nevertheless a failure to make a case of fraud.

 *Fraud in the inception* was alleged by the administrator. The administrator charged that there was a collateral understanding between the joint tenants that the money was deposited for the use and benefit of Grandma and not for the use of Mary P and that the latter would not withdraw from the account except by checks payable to Grandma and only when requested by Grandma and that the joint deposit was made only for "security reasons." Upon proof of a transfer of money to a joint account in reliance upon an oral agreement to hold in trust and upon proof of the subsequent repudiation of this agreement, it could be inferred that the maker of the promise had the intention not to perform at the time the promise was made. This would constitute actual fraud. Jarkieh v. Badagliacco, 75 Cal.App.2d 505, 170 P.2d 994. But these vital allegations were not proved. Proof of fraud must be positive, definite and convincing, Dillard v. Dillard, Mo.Sup., 266 S.W.2d 561, and in order to establish an express or constructive trust in parol the evidence must be clear, cogent, unequivocal and so positive as to banish doubt. Meyer v. Meyer, Mo. Sup., 285 S.W.2d 694; Aronson v. Spitcaufsky, Mo.Sup., 260 S.W.2d 548. The evidence does not rise to this high standard. It was stipulated that the joint account was established on a certain date but none of the facts and circumstances leading up to or attending the event was shown. There was no proof that the joint account was established for the purpose and with the intent of creating a trust arrangement or that Mary P promised to hold the funds in trust. Mabel's statement that the "whole family understood" that the account was opened "to protect Grandma's money" does not constitute substantial evidence that Grandma transferred her funds into the joint account for security reasons only and in reliance upon a collateral agreement by Mary P to hold the funds in trust. The admissions by Mary P that she did not claim the money; that it was "Grandma's" money; that she had no interest in the account other than to see that it went to the right people and that she would pay the money to the executor when he was appointed are not sufficient, without more, to show that the purpose and intent of the parties in executing the signature card and co-depositor contract was to create a collateral trust arrangement. Nor do these admissions, coupled with her subsequent failure to turn the money over to the administrator, show that Mary P had a preconceived fraudulent intent to violate the terms of a collateral trust arrangement.

These admissions are as consistent with a misapprehension on the part of Mary P as to her legal rights under the co-depositor clause as they are indicative of fraud under a collateral trust agreement.

■ *Subsequent fraud:* Nor does this record make out a case of fraud in causing the delay and postponement of Grandma's right of withdrawal until the death of the latter. Since each joint tenant had a right to withdraw the entire amount of the joint account Grandma was not dependent upon Mary P to accomplish such withdrawal. Grandma could have exercised her right to withdraw wholly independent of Mary P, in her own name and on her own motion. Under this evidence Grandma had no right to require Mary P to make the withdrawal for her and no right to rely on Mary P's promise to withdraw the funds and send them to her in Dallas. The administrator stresses neglect of *duty* on the part of Mary P, urging that Mary P owed Grandma a duty to withdraw the funds but no duty was imposed upon the co-tenant under the facts in this case. Mary P's promise was not enforceable. Grandma could not have been prejudiced or damaged by the breach of Mary P's promise as long as Grandma, a joint tenant, had the right and ability to withdraw the funds herself. Although she was feeble there was no evidence to sustain the allegation that because of illness and weakness Grandma became unable to sign her name. The latter, with full knowledge of her right to withdraw on her own signature, refused for reasons satisfactory to her to sign the withdrawal slips which were placed in her hands.

■ *Undue influence:* The administrator claims that a fiduciary relationship existed between Mary P and Grandma and that by exerting undue influence Mary P caused the delay and postponement of Grandma's right of withdrawal until the death of the latter, thereby improperly seeking to obtain the joint funds for her own use and benefit by right of survivorship. There is evidence that Mary P urged

Grandma at St. Louis not to then take the funds but to wait until she reached Dallas, when the funds would be forwarded to her. The administrator argues that Grandma "never drew a check in her life," inferring that she depended entirely upon Mary P to make withdrawals for her. The only reference in the transcript to her lack of experience in writing checks appeared in the following testimony by Mabel: "Q. Do you know of any occasion on which she ever drew a check? A. No, I never did." This is not sufficient evidence to support the argument and inference. There is no evidence that at the time of the events alleged to have occurred in the hotel room at St. Louis the vigor of Grandma's mind had been weakened, either by disease or old age, or that she was particularly susceptible to undue influence. So far as the record shows Grandma, except for forgetfulness, apparently was in full possession of her mental faculties and able to exercise an independent judgment in connection with business affairs. The mere fact that an 89 year old woman lends her joint tenant $3,000, taking promissory notes therefor, does not evidence the existence of undue influence. Indeed, the requirement that notes be executed indicates that the parties were dealing with each other at arm's length and negatives the idea of undue influence. The mere fact that Grandma acquiesced in Mary's refusal to withdraw the funds and of Mary P's promise to forward the funds to her at Dallas do not prove the exertion of undue influence. It repeatedly appears in this transcript that Grandma's acquiescence was induced by the thought that to oppose Mary P in this respect would endanger the collection of the principal or interest due on the notes. As Louise said, "Grandma loved that interest." The thought that she might jeopardize collection of the notes induced Grandma not to insist upon the withdrawal of the funds by Mary P and not to exercise her own right of withdrawal by personally signing a withdrawal slip but there is no evidence or necessary inference of "undue" influence in this regard. Proof of influence is not

sufficient. It must be *undue* influence. Clark v. Leonard, Mo.Sup., 232 S.W.2d 474, loc. cit. 478. The "undue" influence which will impeach a transaction is that type of influence which destroys the will, McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, or the free agency, Gaugh v. Webster, Mo. Sup., 297 S.W.2d 444, of the person alleged to have been unduly influenced or substitutes the will of a dominant for that of a subservient person. Nothing in this record substantiates this idea. Grandma's decision was made not on the basis of any undue influence exercised by Mary P. There is no suggestion that Mary P practiced duress on Grandma by threatening not to pay the principal or interest on the notes if Grandma withdrew the funds in the joint account. That was Grandma's own idea. It was not suggested by Mary P. In making her decision not to withdraw the funds personally Grandma had the benefit of the independent advice of her son, Mabel and Louise. Grandma did not acquiesce in the temporary delay in effecting the withdrawal of the funds because of undue influence by Mary P but because of her own free, calculated and intelligent choice in the voluntary exercise of her own will—her own notion of what course would inure to her financial advantage.

 Finally, the administrator contends that his case is sustained and Mary P's claim is destroyed by reason of the admissions by Mary P that she did not claim the funds and that her only interest was to see that the money went to the right people when Grandma died. The administrator argues that "If such was the agreement at the time the deposit was made, then the whole deposit agreement was testamentary in character and void." Suffice it to say that there is nothing in these statements to indicate that such was the agreement or that these statements relate to the time when the joint account was established. Nor do they constitute an estoppel against Mary P as admissions against interest. While a person may be estopped to assert a right or title by disavowal or disclaimer, 31 C.J.S.

Estoppel § 86, p. 298, the person to whom the disclaimer is made must have acted in reliance thereon and altered his position to his prejudice. Huntsucker v. Clark, 12 Mo. 333. There was no such allegation or showing. In this connection see Bolles v. Boatmen's Nat. Bank of St. Louis, 363 Mo. 949, 255 S.W.2d 725.

Accordingly, the Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

RUDDY, P. J., and MATTHES and ANDERSON, JJ., concur.