**In the Matter of Mattie L. ROBINSON, Ward–Protectee.**

**Dale E. COPE, Successor–Conservator Petitioner–Respondent,**

v.

**WESTERN SURETY COMPANY, Appellant.**

**No. 56501.**

Missouri Court of Appeals, Eastern District, Northern Division.

May 15, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 14, 1990.

Application to Transfer Denied July 31, 1990.

Rollin J. Moerschel, Thompson & Mitchell, St. Charles, for Robert M. Robinson and Western Sur. Co.

Dale Eugene Cope, Troy, for Mattie L. Robinson and Dale Eugene Cope.

JOSEPH J. SIMEONE, Senior Judge.

This is an appeal by Western Surety Company from a final judgment entered on March 10, 1989 by the probate division of the circuit court of Lincoln County ordering that the estate of Mattie Robinson, a disabled and incapacitated person, recover from Robert M. Robinson, the former conservator of the estate, and Western Surety Company the amount of $50,888.22 plus interest from the date of the judgment, representing $43,489.11, the net amount of the proceeds from the sale of the protectee's real estate, and personal property plus interest of $7,399.11. We affirm.

Mattie L. Robinson was an elderly lady born on September 22, 1915. She lived in Troy, Lincoln County, Missouri. Her husband and only daughter predeceased her. She had two grandchildren, Robert Mitchell Robinson of Tacoma, Washington, and Carles M. Coard, a granddaughter. Mrs. Robinson owned some 3.22 acres of real estate, a house and household personal property in Lincoln County, Missouri. On November 10, 1980, sometime after her husband's death, she executed a general warranty deed of her real estate together with her house, held in her name as a single woman, to "Mattie Robinson and Robert M. Robinson as joint tenants with right of survivorship and not as tenants in common." Section 442.450, R.S.Mo., 1986.

Inasmuch as Mrs. Robinson had suffered a stroke affecting the right side of her body, and had a brain tumor leaving her unable to speak, a petition for the appointment of a guardian and conservator was filed on July 17, 1986 by her grandchildren, Robert M. Robinson and Carles Coard. Robert Robinson sought to be appointed as conservator of her estate and Ms. Coard petitioned to be appointed guardian of her person. Chapter 475, R.S.Mo.1986. A hearing was held on the petition on August 6, 1986, after a guardian ad litem was appointed for Mattie. At that hearing it was determined that Mrs. Robinson had had a stroke, that she had a tumor "deep in her brain," that she could not speak, and was therefore disabled and incapacitated. At this hearing, Robert Robinson testified that the real estate is "in my grandmother's name and my name." He testified that he did not give any money for the purchase

of the property, and that his grandmother "did things like that in case something like this [stroke] happened." He said that putting the two names on the property was a gift. He also stated he did not have any interest in the property, was not sure how the property was titled and that his grandmother put his name on the deed to insure that she was taken care of. The court found that Mattie Robinson lacked the capacity to meet essential requirements for her physical care and lacked the ability to manage her financial resources. The court appointed Robert M. Robinson as her conservator, and appointed a designated Missouri agent to receive process in Missouri. Bond was set at $65,000 but later reduced to $50,000. An inventory was filed which did not show the property was held as joint tenants but showed that Mattie and Robert owned the property. The house and real estate were valued at $57,500 and the personal property at $850. The Western Surety Company executed a bond in the amount of $50,000 on August 6, 1986. On August 8, 1986 also, the court entered an order to sell the real estate at private sale for cash for some $57,000 to certain vendees, and a report of the sale was later made by the conservator. However, on August 26, 1986, the conservator moved to set aside the order for sufficient reason, and the order of sale was set aside. An amended inventory was filed appraising the real estate at $52,000. On September 22, 1986, the conservator, Robert Robinson, filed a petition for an order to sell the real estate for some $48,125 at private sale for cash. The court entered its order to sell and the property was sold to Mr. and Mrs. Hutt. In November, 1986, the court entered its order confirming the report of sale and ordered execution of the instruments to effect the purchase.

On December 1, 1986, the sale of the real estate was closed. Robert, as a joint tenant, and his wife and Robert as conservator executed a deed to third persons. The net proceeds of the sale, after certain payments were made to creditors of the protectee in the amount of $42,639.11 plus the value of the personal property in the amount of $850, were forwarded to Robert Robinson, the conservator in the state of Washington. The court ordered the proceeds to be paid into the estate of Mattie, and later ordered Robinson to make an accounting and settlement. No settlements were ever filed by Robert. Although ordered by the court, Robert did not make an accounting for the net proceeds of $42,639.11 or the $850, a total of $43,489.11.

On April 23, 1987, Dale Cope, an attorney in Troy, Missouri, was appointed as the successor conservator of Mattie. In June, 1987, Mr. Cope wrote to Robert Robinson indicating that a settlement had not been made and demanding that the money be turned over and that the failure to do so would result in suit being filed against him and his surety. On August 26, 1987, Cope filed his petition for the discovery of assets alleging that Robert had possession of assets belonging to the estate of Mattie, and that although the court had ordered a settlement during his service as conservator, he has failed to make a settlement and deliver the assets to the court. The petition prayed that the court discover the assets and turn them over. The petition was served on Robert in Tacoma, Washington, and on May 8, 1988, appellant, Western Surety Co. entered its appearance. No response was ever made by Robert. Finally, on August 19, 1988, the successor conservator, Cope, made a motion for judgment by default on the part of Robert and a motion for a determination of Western's liability as the surety. A hearing on this motion was held on December 1, 1988.

At that hearing, Robert did not appear and was in default. Western Surety Company appeared by counsel. The attorney for Robert, who was the attorney who filed the original petition for the appointment of the guardian and conservator, testified. It was his testimony that prior to filing the petition for the appointment of a conservator, he, the attorney, advised Robert against filing the petition to be appointed conservator. The attorney stated:

Not only did I advise him about this thing, but I tried to talk him out of doing the guardianship totally so that he could,

if he'd just wait a while, as I explained to him more than once, if he'd just wait a while, the property is going to be [his]. Don't go through all this trouble and this expense. Told him that more than once, many times. And he insisted upon going through with it after I had explained that the proceeds of any sale of this place are going to go to your grandmother's estate. And you're going to have to make your accounting to the Probate Court for it. Just don't do it. No, he wanted to do it. Insisted upon it.

The attorney also testified that Robert, in the presence of his sister and his wife, said that the deed was made "as a matter of convenience, that it was really his grandmother's property and that she put his name on the deed so that in case of her death he could quickly sell the property and pay her funeral bill." The attorney also testified that Robert continued to say that "It's not my property. It is my grandma's property."

On March 10, 1989, the court issued its judgment and made findings of fact and conclusions of law. The court found that Mattie Robinson's husband died in 1978 and that, on November 10, 1980, she deeded her real estate to herself and Robert Robinson as joint tenants with right of survivorship. The court found that Robert requested to be appointed conservator and that attached to the petition was an exhibit showing that "Mattie L. Robinson and Robert M. Robinson are owners" of the property. The court further found, in finding of fact No. 3, that prior to filing the petition for appointment, and in conferences with his attorney, Robert was advised that he had a legal interest in the real estate, that he did not have to renounce his interest therein and if the property were not sold, he would inherit the whole of the interest upon her death, but that Robert informed his attorney that he did not want any interest in the property and wanted everything to go to the care of Mattie. The court also found in finding of fact No. 6 that, at the hearing on the petition for the appointment of the conservator, Robert claimed to have no interest in the property or the proceeds thereof and that Mattie had put his name on the deed to insure she was taken care of in case "something like this [stroke] happened." The court found that the inventory filed on August 8, 1986 did not purport to show a joint tenancy. In finding of fact No. 10, the court found that the petition to sell the real estate and the subsequent report of sale did not purport to claim any interest in the proceeds, all of which coincided with Robert's testimony. The court indicated that, according to the final report of sale, Robert collected $44,716.27 from the sale, but paid $2,077.16 for his protectee's bills. The balance of $42,639.11 and the proceeds of the sale of the personal property in the amount of $850 have never been accounted for.

In its conclusions of law, the court recognized that the deed of November 10, 1980 created a joint tenancy in the 3.22 acres and the house, and not a tenancy in common, that an interest of a joint tenant is alienable and can be severed in various ways. The court concluded, in its conclusion of law Number 3, that the "major consideration" is the best interests of the disabled person. And since Robert testified that Mattie created the joint tenancy solely to insure that she was to be taken care of, that he had not contributed any of the funds for the joint tenancy, and had no interest in the property,—all represented a "conveyance" of his joint interest to Mattie. The court noted that Robert's "renunciation of his interest and the gift of the property by Mattie was important to the court in appointing him as conservator."

The court therefore ordered that Mattie's estate recover from Robert and his surety, Western Surety Company, jointly and severally, the amount of $43,489.11 ($42,639.11 plus $850) together with interest from April 23, 1987, the date of the appointment of the successor conservator, in the amount of $7,399.11 or a total of $50,882.22 plus interest from the date of judgment.

Some two weeks later, on March 26, 1989, Mattie L. Robinson died.

From this judgment, Western Surety Company appeals. Western Surety Company raises four points on appeal seeking

reversal of the judgment. Western contends that the trial court erred in entering judgment against it and Robert for the reason that (1) Robert had a joint interest in the property and, the doctrine of "equitable conversion," by which a fictional alteration of the real estate is converted into personal property and dealt with as retaining the same joint tenant characteristics as the real estate, applies so that Robert is entitled to the proceeds of the sale and could appropriate the entire proceeds to his own use; and (2) in its findings of fact and conclusions of law Robert renounced his joint interest in the real estate and therefore "conveyed" his joint interest to Mattie since there is no substantial evidence to support such findings of fact or conclusions of law. Western's third point is akin to its first, contending the court erred in entering its judgment because the real estate was "equitably converted" into joint tenancy funds to which he had the right to appropriate to himself. Lastly, and in the alternative, Western contends that Robert is entitled to one-half of the proceeds of the sale as a tenant in common.

The precise issue which must be resolved is whether, a joint tenancy, having been created by the November 10, 1980 deed in Mattie and Robert Robinson, Robert renounced, severed or terminated the joint tenancy by his statements and conduct which were inconsistent with the joint tenancy created in the deed.

We review the cause under the principles set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Our standard of review is that we are to sustain the judgment of the probate court unless (1) there is no substantial evidence to support it, (2) it is against the weight of the evidence, (3) it erroneously declares the law, or (4) it erroneously applies the law. *In re Estate of King*, 572 S.W.2d 200, 202 (Mo.App. 1978).

We do not here deal with joint bank accounts or trust accounts under specific statutes. *Cf., In re Estate of LaGarce*, 487 S.W.2d 493 (Mo.1972); *Hysinger v. Heeney*, 785 S.W.2d 619 (Mo.App.1990). Neither do we deal with the effect of the joint tenancy created by the November 10, 1980 deed upon the death of Mattie Robinson on March 26, 1989 and the rights of Robert Robinson as a survivor. We deal only with the issue of whether during the lives of the joint tenants, one of them who contributed no funds, who furnished no consideration and who obtained the status of joint tenant as a donee, may renounce, terminate or sever the joint tenancy by his acts, statements and conduct during the lives of the two joint tenants. *Cf., Carroll v. Hahn*, 498 S.W.2d 602 (Mo.App.1973).

It has long been settled that a joint tenancy is based on the theory that the joint tenants have but one estate—they hold per my et per tout—by the half and by the whole. *In re Gerling's Estate*, 303 S.W.2d 915, 917 (Mo.1957). The essential elements of the joint tenancy are: (1) the joint tenants must have one and the same interest (unity of interest); (2) the interests must accrue by one and the same conveyance (unity of title); (3) the interests must commence at one and the same time (unity of time); and (4) the property must be held by one and the same undivided possession (unity of possession). *Feltz v. Pavlik*, 257 S.W.2d 214, 218 (Mo.App.1953); *In re Estate of King, supra*, 572 S.W.2d at 211; 20 Am.Jur.2d, *Cotenancy and Joint Ownership*, § 4 at 96. As often stated, there must be four unities: interest, title, time and possession. The leading and distinctive characteristic of an estate in joint tenancy is the right of survivorship.

However, it is well recognized that a joint tenancy may be terminated or destroyed during the lifetime of the joint tenants. Generally, a joint tenancy may be terminated during the lives of the joint tenants by any act, acts or conduct which are inconsistent with the continued existence of the joint tenancy or which operates to destroy or terminate any one or more of the essential unities of interest, title, time or possession. *See* 20 Am.Jur.2d, *Cotenancy and Joint Ownership*, § 15 at 108–109 (1965); annot., Termination of Joint Tenancy, 64 A.L.R.2d 918 (1959) and Supp., annot., 7 A.L.R.4th 1268 (1981). The acts of one joint tenant in terminating the joint

tenancy severs the joint tenancy and vests all interest in the other or in a third person. *See* 64 A.L.R.2d, *supra* at 923. There are many ways to sever or terminate a joint tenancy. In Missouri, it has been recognized that a joint tenancy can be destroyed by conveyance or partition by one or more of the joint tenants during the lifetime of the cotenants. *See Estate of Osterloh v. Carpenter*, 337 S.W.2d 942, 946 (Mo.1960). It was there stated that "prior to the death of a cotenant, or until the tenancy is severed [by conveyance or partition] the joint tenants hold the property by one joint title and in one right." *Id.* However, an executory contract of sale of the real estate held in joint tenancy by the joint tenants to third parties does not, *without evidence of a contrary intention*, terminate the tenancy, and the proceeds of the sale will retain their characteristics of joint tenancy. *In re Estate of King, supra.* In *King*, two joint tenants executed a contract of sale to third parties, and the court held that such a contract did not destroy the joint tenancy, refusing to follow the rule that such tenancy was destroyed recognized in *In re Estate of Baker*, 247 Iowa 1380, 78 N.W.2d 863, 64 A.L.R.2d 902 (1956). While recognizing that there is authority in Missouri that proceeds from the sale of property held in joint tenancy or in the entireties, absent an intent to the contrary, retains its joint characteristics after sale, the making of an executory contract of sale by joint tenants does not equitably convert the proceeds of the sale to one of joint tenancy. *King, supra.*

It has been said that an executory contract to convey one joint tenant's interest severs the vendor's individual interest from the joint tenancy in equity, so that the vendor's successors in interest will be entitled to the purchase money if the vendor dies before the contract is performed. But the courts are divided as to whether there is a severance, entitling each cotenant to a pro rata portion of the purchase money, when all the joint tenants join as vendors in the executory contract. R. Cunningham, W. Stoebuck, and D. Whitman, *The Law of Property* at 208–209 (1984). That a severance is effected so that the vendors are

entitled to the purchase money, *see In re Baker's Estate, supra,* 78 N.W.2d 863, noted in 42 Iowa L.Rev. 646 (1957); 55 Mich.L. Rev. 1194 (1957). That there is no severance, *see Watson v. Watson*, 5 Ill.2d 526, 126 N.E.2d 220 (1955) and Comment 24 Mo.L.Rev. 108 (1959).

In the course of the *King* opinion, the doctrine of equitable conversion was discussed. It was stated that the doctrine is recognized in Missouri, but the doctrine recognized is a traditional and limited one. The doctrine is traditionally applicable when parties enter into an executory contract of the sale of real estate so that the vendee is actually seized of the property. *In re Estate of King, supra.* But the doctrine has also been applied in matters pertaining to the probate of estates. The usual application of the doctrine, in this sense, is when the testator orders his executor to sell real estate and distribute the proceeds to named legatees without any grant of discretion to the executor. A fictional or constructive alteration of the land is created whereby it is to be considered personalty and dealt with as such. *Turner v. Hine*, 297 Mo. 153, 248 S.W. 933 (1923); *Ganahl v. Ganahl*, 323 Mo. 620, 19 S.W.2d 898 (1929). The doctrine is founded on the maxim that equity regards that as done which ought to be done and is a legal fiction which converts real property into personal property, or vice versa, so as to give effect to directions in a will or contract. *O'Bannon's Estate v. O'Bannon*, 142 Mo.App. 268, 126 S.W. 215 (1910); *In re Estate of King, supra,* 572 S.W.2d at 209.

■ Appellant, Western Surety, contends that the doctrine should have even a broader meaning. It contends that upon the sale of the real estate, here held by Mattie and Robert as joint tenants, the proceeds of the sale were "equitably converted" into a joint tenancy so that Robert has a joint tenancy interest in the proceeds and that he is entitled to the same, and may appropriate them to his own use.

But under the circumstances here, we disagree. Under the facts and evidence, Robert relinquished and renounced all right

and interest he had in the real property which he had acquired by the deed of November 10, 1980 from Mattie to herself and Robert. There was substantial evidence for the probate court to conclude that Robert renounced or relinquished his rights in the joint estate, so that Mattie became, during their lifetimes, the sole owner of the joint estate.

Although advised by his attorney not to seek to become the conservator of Mattie's estate, and advised that he had a legal interest in the property, and did not have to petition to sell the property, Robert insisted upon it. The petition for the appointment of a conservator, in an exhibit attached thereto, indicated that Mattie and Robert were the "owners" of the property, and the petition sought a conservatorship. The inventory and appraisment of the property indicating that Robert was not bound in any contract accords with the testimony and evidence in the probate court that Robert had no interest in the property. Robert testified at the hearing on the petition to appoint him conservator of Mattie's estate that he did not furnish any consideration, that he did not purchase an interest in it, that it was purely a gift and that his grandmother put his name on the deed in "case something like this [illness] happened." By filing the petition for conservatorship, by testifying in this matter, and by executing a deed as a joint tenant and as conservator to the purchasers of the property, there was substantial evidence for the probate court to infer and conclude that Robert indicated that he did not have, nor did he desire to have, an interest in the real estate or its proceeds. The whole purpose of the appointment as a conservator, the sale of the property and the use of the proceeds was for the care and comfort of Mattie.

In the hearing, Robert's attorney testified that in the presence of his sister, Carles, and his wife, Robert stated that the deed was made as a matter of convenience, that it was really his grandmother's property and that she put his name on the deed so that in case of her death, he could quickly sell the property and pay her funeral bill. He also continued to insist that the property was not his, but his grandmother's. "Its not my property. It is grandma's property."

The whole purpose of seeking to be appointed conservator and selling the property was to use the proceeds for the care and comfort of Mattie during her remaining days. The property could not be sold without an order of court. Robert alone could not have sold the property. By his acts, statements, conduct and testimony, it is clear that Robert renounced and relinquished his right to an interest in the property. His acts, statements, conduct and testimony were all inconsistent with the continued existence of the joint tenancy and therefore such acts and conduct operated to destroy the joint tenancy created in the November 10 deed. Robert received the proceeds of the sale and has not accounted for the bulk of the money.

Hence, we conclude that the probate court did not err in its findings of fact and conclusions of law. Any other conclusion would have transformed the joint tenancy of the sale of the real estate from one with the right of survivorship to a joint tenancy with a right of appropriation.

Robert did not account for the proceeds and judgment was rendered against him by default. He breached his fiduciary duties. Since a conservator's bond is conditioned upon the faithful discharge of the conservator's duties according to law, and since receipt of the proceeds of the sale of the real estate for which no accounting is rendered is a breach of his bond, the appellant, bonding company, is responsible for Robert's failure to discharge his duties faithfully. Section 475.100, V.A.M.S. and cases cited thereunder.

We have read the entire record, the supplementary record, the briefs and authorities relied upon, including *Krummenacher v. Easton–Taylor Trust Company*, 306 S.W.2d 593 (Mo.App.1957), and conclude that there is no error.

Judgment affirmed.

GRIMM, P.J., and SATZ, J., concur.